483 A.2d 76

**Edmond J. McDONNELL**

**v.**

**COMMISSION ON MEDICAL DISCIPLINE.**

**No. 25, Sept. Term, 1984.**

Court of Appeals of Maryland.

Nov. 2, 1984.

Shale D. Stiller, Baltimore (Frank, Bernstein, Conaway & Goldman, Baltimore, on the brief), for appellant.

Susan K. Gauvey, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen. and Martha H. Somerville, Staff Atty., Baltimore, on the brief), for appellee.

Argued Before MURPHY, C.J., and SMITH, ELDRIDGE, COLE and COUCH, JJ.

MURPHY, Chief Judge.

The question presented in this medical disciplinary case is whether a physician's attempt to intimidate adverse witnesses scheduled to testify against him at a medical malpractice trial constitutes "[i]mmoral conduct of a physician in his practice as a physician" in violation of Maryland Code (1957, 1980 Repl.Vol.), Article 43, § 130(h)(8).

## I.

In 1975, Dr. Edmond J. McDonnell, a Maryland orthopedic surgeon, was sued for medical malpractice by Alvin Meyer, a former patient. Shortly before trial, which was scheduled for May 9, 1977, Meyer retained Drs. Robert Nystrom and Frank Pizzi to testify as medical experts against Dr. McDonnell. Counsel for Dr. McDonnell thereafter quickly deposed both witnesses. It was not until after trial had begun that the depositions were transcribed and Dr. McDonnell was able to read them. He expressed concern to his lawyer at that time that the physician witnesses were inexperienced, had never examined Meyer, and possessed little knowledge of the surgical procedure involved (use of Harrington instrumentation for fixation of the spine). After discussion with his attorney, Dr. McDonnell decided to communicate to Drs. Nystrom and Pizzi his intention of having transcripts of their depositions disseminated to their local and national medical societies. According to Dr. McDonnell, his purpose in doing so was to make certain that the testimony of the witnesses would be honest, reasonable and medically accurate. To this end, Dr. McDonnell initiated a phone call to Dr. Robert Keyser whom he knew to be highly regarded by Dr. Nystrom and from whom Dr. Nystrom had received his training in orthopedic surgery. For the same purpose, Dr. McDonnell also initiated a phone call to Dr. Thomas Langfitt, a physician who had trained Dr. Pizzi in neurosurgery and whom Dr. McDonnell knew to be

highly respected by Dr. Pizzi. Dr. McDonnell's message was thereby conveyed to Drs. Pizzi and Nystrom during the progress of the malpractice trial. While each of the witnesses felt intimidated by the phone calls, they nevertheless testified against Dr. McDonnell at the trial. Upon learning of the phone calls, the trial judge chastised Dr. McDonnell for his misconduct, although he found no improper intent on the physician's part.

The jury returned a verdict in Dr. McDonnell's favor. On appeal, the judgment was reversed for error in the jury instructions with respect to Dr. McDonnell's attempt to intimidate the two expert witnesses. *Meyer v. McDonnell,* 40 Md.App. 524, 392 A.2d 1129 (1978). In its opinion in that case, the Court of Special Appeals characterized Dr. McDonnell's actions as "outrageous" and as "tampering" with the witnesses. The instant medical disciplinary proceedings were thereafter instituted against Dr. McDonnell.

## II.

At the time of the disciplinary proceedings in this case, the Commission on Medical Discipline, a part of the Department of Health and Mental Hygiene, was authorized by Art. 43, § 130(h) to hear charges of "unprofessional conduct" brought against a physician on any of nineteen enumerated grounds; and to "reprimand a physician or place him on probation, revoke or suspend his license, or dismiss the charges." [1] The charge against Dr. McDonnell under

---

**1.** The disciplinary grounds specified in § 130(h) were:

"(1) Fraudulent or deceptive procuring or use of a license.

(2) Solicitation or advertising contrary to § 129 of this article.

(3) The performance of an abortion outside a licensed hospital.

(4) The physician has been charged with a crime involving moral turpitude, and has entered a nolo contendere or guilty plea or has been convicted of the crime.

(5) Abandonment of a patient.

(6)(i) Is addicted to the illegal use of a controlled dangerous substance;

(ii) Habitually abuses any narcotic or controlled dangerous substance as defined in Article 27 of the Annotated Code of Maryland;

§ 130(h)(8)—"[i]mmoral conduct of a physician in his practice as a physician"—was heard by the Commission on April

(iii) Is habitually intoxicated; or

(iv) *Renders professional services under the influence of alcohol*ic beverages; or

(v) Renders professional services while using narcotics or controlled dangerous substances as defined in Article 27 of the Annotated Code, or other drugs, in excess of therapeutic amounts or without valid medical indication.

(7) Promotion by a physician of the sale of drugs, devices, appliances or goods provided for a patient in such a manner as to exploit the patient for financial gain of the physician.

(8) Immoral conduct of a physician in his practice as a physician.

(9) Willfully making and filing false reports or records, in his practice as a physician.

(10) Willful omission to file or record, or willfully impeding or obstructing a filing or recording, or inducing another person to omit to file or record medical reports required by law.

(11) Failure to furnish details of a patient's medical record to succeeding physicians or hospital upon proper request.

(12) Solicitation of professional patronage by agents or persons, or profiting from the acts of those representing themselves to be agents of the licensed physician.

(13) Division of fees or agreeing to split or divide the fees received for professional services with any person for bringing to or referring a patient.

(13-1) Agreeing with clinical or bioanalytical laboratories to make payments to such laboratories for individual tests or test series for patients, unless the physician discloses on the bills to patients or third party payors the name of such laboratory, the amount or amounts paid to such laboratory for individual tests or test series and the amount of his procurement or processing charge, if any, for each specimen taken.

(14) Willful misrepresentation in treatments.

(15) Practicing medicine with an unauthorized person except in an accredited preceptorship or residency training program; or aiding or abetting unauthorized persons in the practice of medicine.

(16) Gross and willful and continued overcharging for professional services;. including filing of false statements for collection of fees for which services are not rendered.

(17) Offering, undertaking or agreeing to cure or treat disease by a secret method, procedure, treatment or medicine.

(18) Professional, physical, or mental incompetency.

(19) Any act or omission which has resulted in disciplinary action against the physician by the licensing or disciplinary authority or court in another state, territory, or country, which, if committed in this State, would be unprofessional conduct pursuant to this section. A copy of the judgment or proceeding under the seal of the clerk of the court or a clerk of the administrative agency which entered same shall be admissible into evidence and shall constitute prima facie evidence of unprofessional conduct under this section."

7, 1981. After an evidentiary hearing, the Commission found as a fact that even if Dr. McDonnell did not intend to influence the testimony of Drs. Nystrom and Pizzi, he should have known that his conduct in having Drs. Keyser and Langfitt contact the two medical experts "was clearly intimidating and was improper." The Commission concluded as a matter of law that Dr. McDonnell violated § 130(h)(8) as charged and reprimanded him.

On Dr. McDonnell's appeal to the Baltimore City Court (now the Circuit Court for Baltimore City), that court held that the Commission's decision was based on an erroneous application of the law to the facts found by it and thus required reversal. The court said that under applicable dictionary definitions Dr. McDonnell's conduct was not immoral, it being neither "so inherently evil that one's conscience recognizes it as wrong or [because] community standards condemn it as wrong." It found a complete absence of evidence of immoral conduct on Dr. McDonnell's part. The court also held that the Commission reached an erroneous legal conclusion when it found that Dr. McDonnell's conduct occurred "in his practice as a physician." It said that conduct, to fall within § 130(h)(8), must be shown to have a "detrimental effect" on the performance of a physician's activities in the practice of medicine. The court concluded that

> "the censured conduct arose only after Dr. McDonnell and his patient were in the adversary position of defendant and plaintiff in a malpractice action. The court has no difficulty in finding that the question of whether or not it was proper to contact witnesses in a law suit was primarily an issue related to the practice of law and was clearly not a decision made by Dr. McDonnell in his practice as a physician."

The Court of Special Appeals, in reversing the judgment of the circuit court, concluded that the Commission, which consisted primarily of physicians, had special expertise in assessing "the effect that the telephone calls initiated by

Dr. McDonnell would have upon the prospective expert witnesses for Meyer." *Com'n on Medical Discipline v. McDonnell*, 56 Md.App. 391, 467 A.2d 1072 (1983). It said that "the seemingly innocuous message that transcripts of [the expert witnesses'] testimony would be forwarded to appropriate medical societies, delivered by the recipients' mentors, would naturally tend to intimidate Drs. Nystrom and Pizzi and constrict their testimony." 56 Md.App. at 402, 467 A.2d 1072. The intermediate appellate court said that the Commission had sufficient evidence before it to support a finding that Dr. McDonnell "initiated the telephone calls in question with the intention of intimidating witnesses in a lawsuit and constricting their testimony against him"; that such conduct "is clearly morally wrong" and "amounts to an endeavor to obstruct justice," a crime involving moral turpitude. *Id.* 56 Md.App. at 403, 467 A.2d 1072. The court disagreed with the circuit court's conclusion that the asserted immoral conduct was not committed by Dr. McDonnell "in his practice as a physician." The court rejected the argument that a physician's conduct, to be immoral "in his practice as a physician," must be shown to have had a detrimental effect upon the performance of such activity. To come within the proscription of § 130(h)(8), the court held that

> "the physician's misconduct need not be confined to his actions in diagnosing or treating a patient but must be directly related to some aspect of the practice of medicine." *Id.* 56 Md.App. at 404, 467 A.2d 1072.

What was involved, the court emphasized, was Dr. McDonnell's effort to suppress evidence that he failed to use adequate skill in treating a patient, a matter which implicated his professional reputation. Affording deference to the Commission's expertise in interpreting that which constitutes or is in "the practice of medicine," the court concluded that the Commission could legally find "that a physician's attempt to protect and preserve his professional reputation is conduct 'in his practice as a physician' because his future practice may well depend upon his reputation." *Id.* We

granted certiorari to consider the important issue involved in the case.

## III.

Before us, Dr. McDonnell admits that his actions were wrong, improper and injudicious. But that is not the issue, he asserts; rather, the primary question is whether his actions were those of "a physician in his practice as a physician," as charged in the disciplinary petition.[2] He maintains that his misconduct had nothing to do with the practice of medicine. Moreover, he notes that the patient-physician relationship which he had with Meyer terminated long before the Meyer trial. He argues that it is not *any* immoral conduct which subjects a physician to sanction under § 130(h)(8) but only that conduct which reflects adversely upon the physician's fitness to practice medicine.[3] No evidence was adduced, he says, to show that his conduct adversely affected his ability or fitness to practice medicine.

The Attorney General argues that Dr. McDonnell's misconduct was inextricably related to the practice of medicine and consequently is within the purview of § 130(h)(8). He contends that the provisions of this subsection encompass not just a physician's technical competence in the practice of medicine but moral character and integrity considerations as well. He relies on a raft of cases from other jurisdictions which, he suggests, indicate that acts done by a physician which are not directly in the course of patient

---

2. By ch. 8 of the Acts of 1981, effective July 1, 1981, Art. 43 was repealed in its entirety, its provisions being recodified, in part, in a new Health Occupations Article of the Code. The provisions of § 130(h), delineating physician disciplinary infractions, became § 14–504 of the new article without any intended substantive change. *See* Revisor's Note accompanying § 14–504. Former § 130(h)(8) was reworded from "[i]mmoral conduct of a physician in his practice as a physician" to "[i]s guilty of immoral conduct in the practice of medicine." § 14–504(3).

3. Dr. McDonnell vigorously asserts that in no event was his conduct immoral. In the view we take of this case, we need not, and do not, pass upon that issue.

care and treatment, but which are otherwise connected to a present or former patient-physician relationship, fall within the ambit of medical disciplinary provisions similar to § 130(h)(8). The Attorney General maintains that Dr. McDonnell's misconduct occurred in the utilization of his medical office and while he was acting as a physician and thus occurred "in his practice as a physician." He stresses that Dr. McDonnell's actions were calculated to protect his professional reputation and ultimately his ability to practice and accept future patients. At the least, therefore, the Attorney General says that Dr. McDonnell's conduct indicated a lack of morality and integrity required of a physician—conduct which constitutes "[i]mmoral conduct of a physician in his practice as a physician."

■ Although we agree that Dr. McDonnell' conduct was improper and not to be condoned, we hold that it is not censurable under § 130(h)(8). We think that "immoral conduct" under that provision must occur while in the performance of a physician's practice within the contemplation of the "Practitioners of Medicine" subtitle of Art. 43 and specifically § 119 thereof. That definitional section, which is applicable to § 130(h), defined practice of medicine"in subparagraph (f) to mean the exercise of "the art of science and medical diagnosis, healing, or surgery" including:

"(1) Operating on, professing to heal, prescribing for or otherwise diagnosing or treating any physical, mental or emotional or supposed ailment of another.

(2) Undertaking by appliance, test, operation, or treatment to diagnose, prevent, cure, heal, prescribe for, or treat any bodily, mental or emotional ailment or supposed ailment of another.

(3) Undertaking to treat, heal, cure or remove any physical, emotional or mental ailment or supposed ailment of another by mental, emotional or other process exercised or invoked on the part of either the physician, the patient, or both.

(4) Assisting, attempting, inducing, or causing by any means whatsoever the termination of a human pregnancy.

(5) Performing acupuncture." [4]

It is readily evident that the legislature, in authorizing disciplinary sanctions against physicians for "unprofessional conduct" under § 130(h), did so with great particularity. *See* footnote 1, *supra.* It expressly outlined and defined nineteen forms of physician misconduct, some of which had no immediate connection with the diagnosis, care or treatment of patients or the practice of medicine, such as habitual intoxication, conviction of a crime of moral turpitude, or the personal use of illegal drugs. In only two of the nineteen described types of misconduct are the disciplinary infractions explicitly limited to a physician's act "in his practice as a physician," *i.e.:*

"(8) Immoral conduct of a physician in his practice as a physician.

(9) Willfully making and filing false reports or records, in his practice as a physician."

It is thus clear, as Dr. McDonnell points out, that it is not *any* immoral conduct of a physician, or *any* willful filing of a false report which constitutes "unprofessional conduct"; rather, the misconduct must occur in the physician's "practice as a physician." Black's Law Dictionary 1055 (5th ed. 1979) defines the "practice of medicine" as the "treatment of injuries as well as the discovery of the cause and nature of disease, and the administration of remedies, or the prescribing of treatment therefor." Similarly, § 119's definition of "practice of medicine," which we think controls the

---

**4.** Section 119(f) was recodified without substantive change as § 14–101(i) of the Health Occupations Article, effective July 1, 1981. Recodification of statutes is presumed to be for the purpose of clarity rather than change of meaning. Thus, a change in the phraseology of statute by recodification will not ordinarily modify the law unless change is so material that the intention of the legislature to modify the law appears unmistakably from the language of the Code. *In re Special Investigation No. 236,* 295 Md. 573, 576–77, 458 A.2d 75 (1983).

meaning of the phrase "practice as a physician" in § 130(h)(8), limits its reach to matters pertaining essentially to the diagnosis, care or treatment of patients.[5] The cases relied upon by the Attorney General, which we have reviewed, are thus inapposite in construing the import and application of § 130(h)(8).

The purpose of disciplinary proceedings against licensed professionals is not to punish the offender but rather as a catharsis for the profession and a prophylactic for the public. *See Maryland St. Bar Ass'n v. Agnew*, 271 Md. 543, 318 A.2d 811 (1974); *Bar Ass'n v. Marshall*, 269 Md. 510, 307 A.2d 677 (1973). *See also Unnamed Physician v. Comm'n*, 285 Md. 1, 400 A.2d 396 (1979), quoting *In re Kindschi*, 52 Wash.2d 8, 319 P.2d 824 (1958). Nevertheless, because there is a punitive aspect to the proceedings, statutes which authorize the imposition of sanctions against the licensed professional should be strictly construed against the disciplinary agency. *See Maul v. State Bd. of Dental Examiners*, 668 P.2d 933 (Col.1983); *New Jersey State Board of Optometrists v. Nemitz*, 21 N.J.Super. 18, 90 A.2d 740 (1952); *Snell v. Com., State Examining Bd.*, 490 Pa. 277, 416 A.2d 468 (1980); *Schireson v. Shafer*, 354 Pa. 458, 47 A.2d 665 (1946); 61 Am.Jur.2d *Physicians and Surgeons, Etc.* § 103 (1981).

It is thus clear that the legislature did not intend that a physician's general moral character would be subject to sanction under § 130(h)(8). In other words, it is not any immoral conduct of a physician committed during the time of his licensure which is within the terms of § 130(h)(8). Nor would that subsection embrace immoral conduct simply because, in some manner, it had a general or associative relationship to the physician in his capacity as a member of the medical profession. On the contrary, as we have indi-

---

**5.** Dr. McDonnell suggests, and we agree, that the classic illustration of "[i]mmoral conduct of a physician in his practice as a physician" is the commission of a sex act on a patient, while the patient is under the doctor's care.

cated, the application of § 130(h)(8) is directly tied to the physician's conduct in the actual performance of the practice of medicine, i.e., in the diagnosis, care, or treatment of patients. Unquestionably, Dr. McDonnell's act in initiating the improper phone calls was related to his professional practice. But his act was not done in the course of the actual practice of medicine, as defined in § 119(f). Consequently, the imposition of the sanction of reprimand upon Dr. McDonnell must be vacated.

JUDGMENT REVERSED; CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REMAND THE MATTER TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR ENTRY OF JUDGMENT REVERSING THE DECISION OF THE COMMISSION ON MEDICAL DISCIPLINE AND DISMISSING THE DISCIPLINARY PETITION; COSTS TO BE PAID BY APPELLEE.