492 A.2d 963

H. Herbert INSEL

v.

Stephen M. SOLOMON.

Nos. 1325, 1326, Sept. Term, 1984.

Court of Special Appeals of Maryland.

May 22, 1985.

Robert A. Rohrbaugh, Rockville, for appellant.

Harry C. Storm, Bethesda (Kenneth R. West and Abrams, West & Storm, P.C., Bethesda, on brief), for appellee.

Argued before WILNER, BLOOM and ROBERT M. BELL, JJ.

WILNER, Judge.

We have before us a disagreement between two ophthalmologists (Dr. Insel and Dr. Solomon) over the termination of their corporate practice. Unable to resolve their differ-

ences amicably, each sought the assistance of the Circuit Court for Prince George's County, which found in favor of Dr. Solomon. Dr. Insel appealed.

The parties began their professional association in 1973, when Dr. Solomon became an employee of the older Dr. Insel. In 1976, they entered upon a new arrangement. By contract dated June 30, 1976, it was agreed that the practice would be carried on through a professional association, that the two physicians would each own half of the outstanding common stock, and that each would have an equal voice in the management of the corporation. This equality as to management was largely reflected in paragraph 4 of the contract, which provided, in relevant part, that the two would have equal representation on the board of directors and that,

"Each Physician agrees that (i) the management of the Corporation's affairs shall be carried out through a continuous process of consultation and agreement between them in which process they are to be completely co-equal, and (ii) no material action regarding the operation of the Corporation's practice or business shall be taken by either of them without prior consultation with and agreement of the other. Neither Physician shall be accountable to the other for his medical decisions."

Several provisions in the contract dealt with termination of the mutual venture. Paragraph 8 provided, in relevant part, that if Dr. Insel retired "following the third year of Dr. Solomon's employment," the corporation would purchase all of his stock "paying therefor an amount equal to five (5%) percent of the gross income of the Corporation for the ensuing three (3) years." If Dr. Solomon died or became disabled after three years, the corporation agreed to repurchase his stock for an amount equal to 10% of his average gross monthly income for a period of three years. Paragraph 9 stated, in relevant part:

"Dr. Solomon agrees that, upon Dr. Insel's written request that Dr. Solomon leave the Corporation, and effective upon an equitable division of the Corporation's

practice, assets, and liabilities, Dr. Solomon will resign from the Corporation and surrender all of his stock (or rights thereto) to the Corporation in an exchange which the Physicians shall endeavor to structure in a tax-free manner."

Paragraph 10, dealing with a quite different contingency, provided:

"*Loss of License, et cetera.* Should any physician stockholder or employee lose his medical license, be convicted of moral turpitude or involved in unethical or immoral conduct or embezzlement, his relation to the Corporation will terminate with provisions as above for separation from the Corporation (as in total disability)."

On September 30, 1982, Dr. Insel informed Dr. Solomon that he (Dr. Insel) intended to retire "as a partner in the P.A." effective the next day. Presumably, that would have brought into operation paragraph 8 of the 1976 agreement. Dr. Insel had prepared a new agreement, however, which he had already signed and which he asked Dr. Solomon to sign. Under this agreement, Dr. Insel was to continue practicing with the corporation "[a]s a contract physician" at a compensation equal to 60% "of his charges." More important, as part of its purchase of his stock, the corporation was to pay him "for his accounts receivable as received by the P.A.," which, according to Dr. Solomon, it was not obliged to do under the 1976 agreement.

Dr. Solomon refused to sign the new agreement, whereupon Dr. Insel decided not to retire. The parties attempted on several occasions thereafter to come to terms, but without success. On November 30, counsel for Dr. Insel sent a revised agreement to Dr. Solomon. In a covering letter, he noted that the doctors had "discussed the financial arrangements in a friendly and gentlemanly fashion whereby the manner of [Dr. Insel's] departure can be effected so that the transition can be fair and orderly to you both as well as the respective patients of the P.A." On December 6, counsel informed Dr. Solomon that unless the agreement sub-

mitted on November 30 was signed and returned by December 10, "the proposed agreement is withdrawn and no concessions re earned income shall be considered; also, you may thereafter expect the matter of *your* interest to be litigated." (Emphasis added.) In neither of these letters did counsel suggest that Dr. Solomon had conducted himself improperly or that Dr. Insel intended to seek *his* (Dr. Solomon's) ouster from the corporation.

Nonetheless, on December 16, 1982, Dr. Insel commenced this action (E–82–1858) with a bill for specific performance in which he accused Dr. Solomon of a whole range of misconduct, including engaging in practices "which are illegal relative to the practice of medicine with patients." By reason of this misconduct, he averred that Dr. Solomon "must consider himself expelled from the Professional Association and be bound by paragraphs 9 & 10 respectively . . . and that any and all professional or official positions of the Defendant with the Professional Association, including retirement plans, are terminated." He asked that Dr. Solomon be enjoined from practicing ophthalmology as a member of the corporation and that the provisions of the 1976 agreement "be specifically enforced relative to the termination of [Dr. Solomon's] services. . . ."

Coupled with this suit, counsel advised Dr. Insel that he need not wait for the court to act—that under the contract "you are authorized . . . to cause [Dr. Solomon's] withdrawal from the said Professional Association forthwith," that his "participation in the offices of the Professional Association . . . may be terminated effective immediately and his right or authority to engage in any phase of the operation and business of the Association or related activities thereof including retirement plans may be terminated as provided in said agreement." Presumably acting upon this advice, Dr. Insel immediately changed the locks at the College Park office, closed the corporate bank account, removed Dr. Solomon's diplomas and personal effects from the College Park office, and called Dr. Solomon's patients and told them that Dr. Solomon was no longer available. All of this was

done after office hours and without advance warning to Dr. Solomon.

Dr. Solomon responded with a petition for injunctive relief, docketed as E–82–1866. On December 18, 1982, the court ordered Dr. Insel to provide Dr. Solomon with access to his (Dr. Solomon's) patients, patient records, and the corporation's offices in College Park and Bowie and enjoined Dr. Insel from contacting Dr. Solomon's patients or attempting to delete Dr. Solomon from the corporation's malpractice insurance. In January, Dr. Solomon filed a counterclaim in E–82–1858 in which he recited what had occurred and asked that the court, (1) declare that, by his actions, Dr. Insel effectively retired from the corporation or, alternatively, had materially breached the 1976 agreement, (2) require Dr. Insel to provide an accounting of income and expenses since December 1, 1982, and (3) award counsel fees.

Dr. Insel continued to press his attack. In August, 1983, he amended his bill of complaint to allege a new range of unethical conduct on the part of Dr. Solomon—appropriating Dr. Insel's patients, distributing personal business cards, misinforming and fraudulently making material misrepresentations of fact to patients concerning the nature of medical treatment rendered to them, and otherwise engaging "in numerous and continual acts of professional misconduct which are violative of ethical standards existing within the medical community...." In October, Dr. Solomon amended his counterclaim to add an averment that the parties were so divided as to how the corporation should be managed that the votes required for action by the board of directors could not be obtained. For that reason and because of the oppressive conduct of Dr. Insel, Dr. Solomon asked that the corporation be dissolved pursuant to Md. Code Ann.Corps. & Ass'ns art., § 3–413.

The two cases—claim and counterclaim in No. 1858 and request for injunctive relief in No. 1866—came to trial on March 8, 1984. The course of the proceeding, and, in

essence, the result of it, were determined in an early ruling by the court. Dr. Insel's case hinged on paragraph 10 of the 1976 agreement. His position was that Dr. Solomon had been "involved in unethical or immoral conduct," which thereby caused his "relation to the Corporation" to terminate. In an effort to prove the "unethical or immoral conduct," he (1) caused to be issued a subpoena duces tecum to Doctors Hospital for the complete medical records of eighteen patients, and (2) proposed to call four expert witnesses to testify that certain things allegedly done by Dr. Solomon were unethical.

The hospital resisted the subpoena with a motion to quash, arguing that disclosure of the patient records would violate the confidentiality requirements of Md.Code Ann. Health-Gen. art., § 4–301. Dr. Solomon, through a motion *in limine,* moved to exclude "any expert testimony pertaining to alleged unethical or immoral conduct on the part of Dr. Solomon...." The bases of that motion were that (1) jurisdiction to determine unethical conduct on the part of a physician was vested exclusively in the State Commission on Medical Discipline, and, on an "exhaustion of administrative remedy" theory, the court had no authority to hear or determine such a matter, (2) paragraph 10 of the agreement did not mean what it seemed to say—that it must be read as applying only to an actual loss of medical license or conviction—and (3) the issue of unethical or immoral conduct was not the proper subject for expert testimony.

The court adopted the first and second of Dr. Solomon's arguments, concluding:

"It's quite clear that paragraph ten is merely a business agreement to provide for the contingency of one of its members losing a license. It does not give this Court jurisdiction to adjudicate the conduct of a doctor at the bequest or request of another doctor under a business association in a contract case, and, therefore, it is quite clear to the Court that there will be no evidence in this case of any kind of medical malpractice, unethical con-

duct, because that is not what is contemplated by the contract on its face."

On that basis, the court granted the hospital's motion to quash and Dr. Solomon's motion *in limine*. Accepting the court's preliminary ruling, Dr. Insel offered no evidence in his case; he proffered his own testimony that in July or August, 1982, he discovered that Dr. Solomon had failed to give one or more patients informed consent advice and had printed and distributed business cards in his own name, but he actually offered no evidence. Accordingly, Dr. Solomon moved for, and the court granted, summary judgment in the case of *Insel v. Solomon*, and the matter proceeded thereafter on Dr. Solomon's counterclaim, upon which there was a full evidentiary hearing.

We need not recount all of the evidence presented on the counterclaim, some of which was conflicting. It will suffice to say that, once Dr. Solomon refused to accede to Dr. Insel's proposed changes in the 1976 agreement, Dr. Insel took unilateral and deliberate action which had the effect, if not the intent, of making a harmonious practice, first, difficult, and ultimately impossible. He attempted to change Dr. Solomon's work schedule, he discharged the corporation's attorney, he removed and altered patient records, and, on December 16, 1982, he took the affirmative steps noted above actually to exclude Dr. Solomon from the office, from the patients, and from all patient records. Only by virtue of a court injunction, subsequently extended in a consent order, was Dr. Solomon readmitted to the corporate practice. Thereafter, Dr. Solomon said, they could not agree on anything.

On June 26, 1984, the court filed an opinion and order in which it (1) reviewed the history of the dispute, (2) confirmed its earlier determination that any question of unethical or immoral conduct on the part of Dr. Solomon would have to be resolved by the Commission on Medical Discipline, (3) found that, by his unilateral actions, Dr. Insel had breached paragraph 4 of the 1976 agreement (*see ante*),

and that his breach was substantial enough to justify rescission of the agreement, and (4) found that, by reason of Dr. Insel's oppressive actions and the deterioration in the personal and professional relationship between the parties, Dr. Solomon was entitled to a dissolution of the corporation under Corps. & Ass'ns art., § 3–413. The court also found that Dr. Insel's court action was brought in bad faith and without justification—that it "was only brought when Dr. Solomon refused Dr. Insel's request for larger retirement benefits" and was "motivated by greed and lacked any legal justification whatsoever."

Upon these findings, the court, in its order, (1) dissolved the corporation, (2) appointed a receiver to liquidate the corporation, (3) awarded attorneys fees and costs under former Md.Rule 604b to Dr. Solomon in the amount of $13,904, (4) directed Dr. Insel to provide Dr. Solomon access to the corporate offices, bank accounts, and patient records "pending the dissolution of the corporation," and (5) enjoined Dr. Insel from interfering with Dr. Solomon's practice of ophthalmology.

Both parties have appealed. Dr. Insel complains about the court's preliminary ruling precluding him from offering evidence as to Dr. Solomon's unethical or illegal conduct and about the award of counsel fees. Dr. Solomon complains that he did not get all of his counsel fees.

Dr. Insel's order for appeal was broad enough to include an attack on the court's order dissolving the corporation, and indeed he made substantial efforts to have that part of the judgment stayed. After he lost that battle, however, it was agreed at a prehearing conference conducted pursuant to Md.Rule 1024 that "[w]hether the court erred in ordering dissolution of the corporation is not an issue on appeal." The dissolution, we are told, has been completed and the net funds collected by the receiver are being held subject to further court order as to distribution. In light of that circumstance, Dr. Solomon asks that we dismiss Dr. Insel's appeal as moot.

■ There can be little doubt but that these post-judgment events effectively render moot Dr. Insel's prayers for relief in the circuit court. The whole point of his action was to exclude Dr. Solomon from participation in the corporation and the corporate practice, and *that*, of course, has been achieved through the dissolution and liquidation of the corporation. Whether the court was right or wrong in finding a breach of the agreement by Dr. Insel, in ordering the corporation dissolved, or in requiring access by Dr. Solomon to corporate offices and records is no longer of any practical concern. Nor is there any effective relief that we can afford in any event in those regards. But the award of attorneys fees is still very much in contention; that is by no means moot. It is, however, the only aspect of either appeal that we shall address.

■ The award of attorneys fees, as noted, was based on the court's finding that Dr. Insel's action was without substantial justification and was brought in bad faith. That determination proceeded in large measure, however, from the court's earlier ruling that paragraph 10 of the 1976 agreement applied only in the event of a loss of license or actual conviction, and that the court was precluded from considering evidence as to unethical, immoral, or illegal conduct in the context of Dr. Insel's suit. That ruling necessarily cut the heart out of Dr. Insel's action; as further implemented, it effectively precluded Dr. Insel from establishing the basis of his lawsuit.[1] If the ruling was wrong, therefore, the court's conclusion that the action was without substantial justification and was brought in bad faith must be reexamined.

---

1. The granting of a motion *in limine*, standing alone, does not constitute reversible error. *Funkhouser v. State*, 51 Md.App. 16, 24, 440 A.2d 1114 (1982). Unless the party losing the motion actually offers the evidence at trial and has it rejected, he has no cognizable complaint. Here, however, there was more than the mere granting of that motion. The hospital's motion to quash was also granted, thereby actually denying evidence to Dr. Insel, and at trial on the counterclaim, Dr. Insel was precluded on at least one occasion from testifying about what he regarded as Dr. Solomon's unethical conduct.

The court's ruling seemed to rest on two, somewhat overlapping bases—one, that as a matter of contract interpretation, paragraph 10 did not apply to unethical conduct but only to loss of license or conviction, and, two, that the issue of unethical conduct could be resolved only by the Commission on Medical Discipline. The court appeared to assume that if a proceeding were commenced before the Commission and the Commission determined that Dr. Solomon's conduct was unethical, it would revoke his license, and *then* paragraph 10 would become applicable. We think that the court erred on all counts.

We look first at the contract. Paragraph 10, as noted earlier, states that "[s]hould any physician stockholder ... lose his medical license, be convicted of moral turpitude or involved in unethical or immoral conduct or embezzlement, his relation to the Corporation will terminate...." It is at once evident that this is not a well-drafted provision. One is not "convicted of moral turpitude." Although a person may be convicted of embezzlement, he or she may not be "convicted" of being "involved in unethical or immoral conduct." The term "convicted" or "conviction" usually implies a judgment in a criminal proceeding in court (*Western Union Telegraph Co. v. State*, 86 Neb. 17, 124 N.W. 937, 938 (1910); *McMahon v. Mead*, 30 S.D. 515, 139 N.W. 122, 125 (1912); *Succession of Medica*, 163 So.2d 425, 427 (La.App.1964); *Martin v. State*, 116 A.2d 685 (Del.1955); *Ammidon v. Smith*, 1 Wheat. 447, 461, 4 L.Ed. 132 (1816); *Black's Law Dictionary*, 4th ed., at 403, and neither "unethical or immoral conduct" nor "moral turpitude" has yet been declared criminal.

■ The inclusion of those concepts and of those words in paragraph 10 must mean something, however. Courts are not free simply to ignore provisions in a contract because they may be poorly drafted. Rather, "under the objective law of contracts, a court, in construing an agreement, must first determine from the language of the agreement itself, what a reasonable person in the position of the parties

would have meant at the time it was effectuated." *Aetna Cas. & Sur. v. Ins. Comm'r*, 293 Md. 409, 420, 445 A.2d 14 (1982). If the language is clear, it controls; if it is ambiguous, the court may consider extrinsic factors in ascertaining what the parties intended. *Della Ratta, Inc. v. Amer. B. Com. Dev.*, 38 Md.App. 119, 130, 380 A.2d 627 (1977).

■ Applying these principles, it is clear that the court erred in reading out of paragraph 10 the involvement in unethical or immoral conduct and restricting that paragraph to actual loss of license or conviction of embezzlement. The agreement was intended to form the basis for the joint and collective practice of medicine. Such a "partnership," in some respects, is like a marriage; it presupposes a mutual trust and confidence that each member will at all times act properly. Especially in a professional venture, improper conduct on the part of one, whether or not associated directly with the practice of the profession, may and often will come to tar the "partnership" through which each acts, and thus may eventually affect the individual reputations of the other professional members. Guilt by association is often unfair, but it is not always without foundation. It is therefore not unreasonable—indeed it may be prudent—for each participant to want the ability to detach either himself or the erring party from the venture in the event of such conduct, quickly and without financial penalty. That, of course, was the obvious purpose of paragraph 10.

Is it reasonable, then, to require first that the errant party be "convicted" of a crime or have his license revoked by the Commission on Medical Discipline? We think not, for several reasons.

Under Md.Code Ann. Health Occ. art., § 14–504, the Commission is authorized to reprimand a physician, place him on probation, or suspend or revoke his license for twenty-five enumerated reasons, one of which being that the physician "[i]s guilty of immoral conduct in the practice

of medicine." As the Court of Appeals made clear in *McDonnell v. Comm'n on Medical Discipline,* 301 Md. 426, 483 A.2d 76 (1984), however, that is a restrictive standard. At 436, 483 A.2d 76, the Court held:

> "It is thus clear that the legislature did not intend that a physician's general moral character would be subject to sanction under [§ 14–504].[2] In other words, it is not any immoral conduct of a physician committed during the time of his licensure which is within the terms of [§ 14–504]. Nor would that [section] embrace immoral conduct simply because, in some manner, it had a general or associative relationship to the physician in his capacity as a member of the medical profession. On the contrary, as we have indicated, the application of [§ 14–504] is directly tied to the physician's conduct in the actual performance of the practice of medicine, *i.e.,* in the diagnosis, care, or treatment of patients."

It is thus evident that the range of unethical or immoral conduct subject to the Commission's jurisdiction is considerably more narrow than that encompassed by paragraph 10 of the agreement. Conduct that may well reflect adversely on the professional association and thus on all of its professional members may be beyond reach by the Commission.

Second, as noted, even if the Commission, in a proceeding properly before it, were to find "immoral conduct in the practice of medicine," it is not obliged to suspend or revoke the physician's license. It may, as it attempted to do in *McDonnell,* simply reprimand the physician. Under Dr. Solomon's and the circuit court's view, even that would not trigger paragraph 10; indeed, one could reasonably argue, under that view, that even a suspension, as opposed to revocation, of the license would not suffice.

---

**2.** The Court was actually dealing with the predecessor statute to § 14–504—Md.Code Ann. art. 43, § 130(h)—which, it noted at 435, was substantially the same as § 14–504.

Finally, in light of the well-known dread that all physician's have of malpractice actions, it hardly seems reasonable to suppose that either of the parties intended to condition the application of paragraph 10 on a proceeding before the Commission. Although the Commission's preliminary investigation of charges is confidential, a finding that "there are grounds for action under § 14–504" is not. *See* § 14–501(e); § 14–506. Moreover, there would be nothing to preclude individual patients who may be called as witnesses before the Commission from filing suit based on information they learn as the result of the Commission proceeding. It certainly would be expected that, in any such action, the professional association, containing the names of both physicians, would be named as a co-defendant.

■ The court's error, as we have observed, necessarily taints its conclusion that Dr. Insel's action was without substantial justification and was brought in bad faith. That is not to say, however, that the court's ultimate conclusion was wrong, but simply that it rested on a faulty premise. We shall remand the case to the circuit court for further proceedings on the issue of attorneys fees. Dr. Insel must be permitted to show, if he can, that Dr. Solomon may have engaged in conduct falling within the ambit of paragraph 10 of the agreement. The test, of course, is not whether he can prove such conduct to the court's satisfaction, but whether he had a reasonable basis for believing that it had occurred and thus for bringing the action.

Dr. Insel argues that the court's resolution of this question may affect the distribution of the corporate assets to the parties. We express no opinion on that, as it is not presently before us.

JUDGMENT AFFIRMED IN PART AND VACATED IN PART. CASE REMANDED TO CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS; COSTS TO BE DIVIDED EQUALLY.