**William L. JOSEPH, M.D., Petitioner,**

v.

**DISTRICT OF COLUMBIA BOARD OF MEDICINE, Respondent.**

**No. 90–710.**

District of Columbia Court of Appeals.

Argued Jan. 23, 1991.

Decided March 14, 1991.

Ronald G. Precup, with whom Carrie L. Bumgarner, Washington, D.C. was on the brief, for petitioner.

Edward E. Schwab, Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Washington, D.C., Deputy Corp. Counsel, were on the brief, for respondent.

Before SCHWELB and FARRELL, Associate Judges, and PRYOR, Senior Judge.

SCHWELB, Associate Judge:

Dr. William Joseph asks us to review a final decision of the District of Columbia Board of Medicine in which he was reprimanded and ordered to pay a civil fine. The Board found that conduct for which Maryland had previously disciplined Dr. Joseph, namely, false testimony and misrepresentations made by him in his capacity as an expert witness in a medical malpractice case, constituted a false report in the practice of medicine, and thus provided grounds for disciplinary action in the District of Columbia. *See* D.C.Code § 2–3301.2(7) (1989). Dr. Joseph contends that in so finding, the Board misconstrued the statutory definition of practice of medicine. We affirm.

I

Dr. Joseph is a physician specializing in emergency medicine and shock trauma. He is licensed in Maryland and the District of Columbia. He practices primarily in Maryland.

For many years, Dr. Joseph has offered his services as an expert witness in medical malpractice litigation. Since approximately 1980, he has been associated with Forensic Medical Advisory Services (FMAS), a firm based in Bethesda, Maryland which provides the services of medical experts to civil litigants. In a typical year, Dr. Joseph evaluates approximately twelve requests from litigants or attorneys, but he testifies as an expert witness only once or twice.

In 1984, as a result of his association with FMAS, Dr. Joseph appeared as an expert witness for the plaintiff in a South Carolina medical malpractice case involving the death of a young girl during surgery. Under cross-examination at trial, Dr. Joseph testified falsely that he was board-certified in thoracic surgery. A *curriculum vitae* which he provided to counsel during discovery contained other false information about his academic credentials. Specifically, Dr. Joseph falsely claimed in this document that he had ranked first in his medical school class and that he had graduated Phi Beta Kappa from Williams College. The *curriculum vitae* also depicted him as

a member of certain professional societies in which his membership had in fact lapsed.

Dr. Joseph's misrepresentations were brought to the attention of the Maryland Commission on Medical Discipline, which charged him with "immoral conduct" and with making false reports or records in the practice of medicine. See Md. Health Occ. Code Ann. §§ 14–504(3) & (4) (1981). Without specifically admitting the truth of the charges in the Maryland proceeding, Dr. Joseph did not contest them.[1] Rather, he agreed to the entry of an order reprimanding him for his conduct. In that order, which was issued on June 16, 1987, the Maryland Commission concluded, among other things, that Dr. Joseph had "willfully made a false report or record in the practice of medicine." The Commission stated that

it is the practice of medicine in Maryland when a medical expert in a malpractice case is retained to give his/her opinion based on the patient's records as to the standard of care required, the standard of care given, and the damage caused to the patient by the medical care rendered by another physician.

The American Medical Association informed the District Board of Medicine of the Maryland Commission's decision in a letter dated December 16, 1987. The Board then instituted these proceedings pursuant to D.C.Code § 2–3305.14(a)(3) (1989), which authorizes it to impose reciprocal discipline, based on a decision of a licensing authority of another jurisdiction, when the underlying conduct "would be grounds for disciplinary action" under District law.

A hearing was held before the Board on February 1, 1987. In its final order dated May 2, 1990, the Board held that Dr. Joseph was subject to discipline pursuant to

D.C.Code § 2–3305.14(a)(8) (1989), because he had "[w]illfully [made] or [filed] a false report *in the practice of a health occupation.*" (Emphasis added.) The health occupation, of course, was medicine.

The practice of medicine is defined in D.C.Code § 2–3301.2(7) (1989) as

the application of scientific principles to prevent, diagnose, and treat physical and mental diseases, disorders, and conditions and to safeguard the life and health of any woman and infant through pregnancy and parturition.

The Board found against Dr. Joseph on the only contested question in the case, namely, whether his false statements were made in the practice of medicine:

This Board ... determines that the practice of medicine (as defined in the act) encompasses the actions of Respondent. In giving testimony as an expert witness, Respondent renders an opinion based on his application of scientific principles in diagnosing and treating physical diseases. Such testimony given by a non-treating physician is in the nature of giving a second opinion. The Board further recognizes a sphere of actions attendant to the practice of medicine which would include such things as filing medical insurance reports and giving expert testimony. These sorts of actions not only arise out of the practice of medicine, but also depend on the actor's being licensed. As it is Respondent's license to practice medicine which enables him to testify as an expert, the Board determines that such action constitutes the practice of medicine.

Contending that the Board has misconstrued the statutory definition of practice of medicine, Dr. Joseph requests us to vacate its decision.

---

1. At the hearing before the District's Board of Medicine, however, Dr. Joseph testified on direct examination as follows:

    Q. In the course of [cross examination at the South Carolina trial], was there a question raised about whether you were board-certified in thoracic surgery?
    A. Yes, sir, there was indeed.
    Q. All right, and you answered that question falsely?

    A. Yes sir, I did indeed.

Dr. Joseph also told the Board that he knew the testimony was false immediately after giving it. He further acknowledged that information in his *curriculum vitae* was false. In fact, Dr. Joseph testified that, upon his return to Washington, he physically destroyed all of the copies of the *curriculum vitae* which contained these falsehoods.

## II

■ According to Dr. Joseph, § 2–3301.2(7), quoted above, "defines the practice of medicine solely in terms of patient care." Observing that the patient was already dead at the time of the misrepresentations in the South Carolina proceeding, Dr. Joseph argues that he made no false report or record "in the practice of medicine." Although his proposed interpretation of the statute is perhaps a plausible one, it is not the only plausible one, and we cannot say that the Board was plainly wrong in rejecting it.

■ The members of the Board of Medicine are presumed to have substantially greater familiarity than do judges with the meaning of terms like "the practice of medicine." The determination to be made is one that demands the type of agency expertise and informed discretion towards which we generally show great deference. *Bender v. District of Columbia Dep't of Employment Servs.*, 562 A.2d 1205, 1209 (D.C.1989). Accordingly, we must give the Board's decision substantial weight. *Winchester Van Buren Tenants Ass'n v. District of Columbia Rental Hous. Comm'n*, 550 A.2d 51, 55 (D.C.1988); *see Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). The Board's interpretation of the statute is binding on us unless it is plainly erroneous or conflicts with the language or purpose of the statute. *Lee v. District of Columbia Dep't of Employment Servs.*, 509 A.2d 100, 102 (D.C.1986); *see also Roberts v. District of Columbia Bd. of Medicine*, 577 A.2d 319, 326 (D.C.1990). In order to sustain the Board's decision, we "need not conclude that the agency's construction was the only one it permissibly could have adopted ... or even the reading the court would have reached·if the question initially had arisen in a judicial proceeding." *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 n. 11, 104 S.Ct. 2778, 2782 n. 11, 81 L.Ed.2d 694 (1984); *Lee, supra*, 509 A.2d at 102. If the Board's interpretation can reasonably be reconciled with the statute, our task is at an end.

■ The District of Columbia Health Occupations Revision Act of 1985, which is now codified at D.C.Code § 2–3301.1 et seq. (1989), and which contains the quoted definition of "practice of medicine," is a part of a "comprehensive reorganization and modernization of the District's professional and business licensing laws." *Davidson v. District of Columbia Bd. of Medicine*, 562 A.2d 109, 112 (D.C.1989). The Act was designed "to address modern advances and community needs *with the paramount consideration of protecting the public interest.*" *Id.*, quoting REPORT OF THE D.C. COUNCIL ON CONSUMER AND REGULATORY AFFAIRS ON BILL 6–317, at 7 (November 26, 1985) (emphasis added). Although the rule of lenity has been invoked in disciplinary proceedings against physicians, *see Texas State Bd. of Medical Examiners v. McClellan*, 307 S.W.2d 317, 320 (Tex.Civ.App. 1957), we may not apply that rule so rigorously as to undercut the "paramount" legislative purpose. Notwithstanding the rule of lenity, "laws pertaining to public health and public safety, though penal in nature, must be given substantial effect." 3 N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 59.05, at 33 (4th ed. 1986). Moreover, there can be no question that deliberate lying under oath, as well as a professional person's misrepresentation of his or her qualifications on a resume or otherwise,[2] constitute dishonorable and impermissible behavior. Adherence to the rule of lenity is less appropriate where, as in our view here, the offense was *malum in se. Id.*, § 59.03, at 13. "[N]o one should be surprised," *see United States v. Speidel*, 562 F.2d 1129, 1131–32 n. 4 (8th Cir. 1977), that Dr. Joseph's conduct in this case was not countenanced by the Board of Medicine.

■ With these principles in mind, we look to the language of the statute, *see Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C.1983) (en banc), to determine whether it may reasonably be construed as the Board construed

---

**2.** *See In re Banks,* 561 A.2d 158 (D.C.1987), holding that it was misconduct for a professional to represent himself to the public as having credentials that he did not in fact possess.

it. The practice of medicine is defined in § 2–3301.2(7) as the "application of scientific principles to *prevent, diagnose* and *treat* physical and mental *diseases,* disorders *and conditions* ..." (Emphasis added).[3] It is undisputed that, as an expert witness, Dr. Joseph brought scientific principles to bear upon his subject. Since the patient was dead, Dr. Joseph could not *prevent* her disease, nor was he in a position to *treat* it. Accordingly, the key word in the statutory definition is *diagnose,* and the question before us is whether it was "plainly erroneous" for the Board to conclude that Dr. Joseph engaged in diagnosis within the meaning of the Act.

■ At the hearing before the Board, Dr. Joseph described his activities in the South Carolina case as follows:

I reviewed medical records regarding the care and treatment of the child who had an upper gastrointestinal bleeding condition....

There was a 13–year old child who was admitted to the hospital because of some type of condition which [had] produced some upper gastrointestinal bleeding. Observation and management of the child were such that she required an elective operative procedure. The day of the operative procedure, a flat and upright x-ray of the abdomen was obtained which showed a large dilated stomach filled with blood and gastric secretions. The child was brought to the operating room with no attempt to evacuate the stomach prior to the induction of anesthesia, nor was the anesthesiologist informed of the necessity to do a quick crash-in because of the largely dilated stomach. At the time of induction anesthesia, the child vomited, aspirated and expired. I testified feeling that having seen the x-ray of the child prior to the performance of an elective operative procedure, that in my opinion it was below the standard of care to either fail to insert a nasogastric tube to evacuate the

child's stomach to reduce the incidence of aspiration pneumonia, or to inform the anesthesiologist [of the] failure to evacuate the stomach so that a crash-in could be performed. And that essentially was the case.

It is evident from the foregoing passage that Dr. Joseph examined the X-rays and medical records of the decedent to determine why she died and who was responsible for the condition that led to her death. The first and third definitions of "diagnosis" in WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 622 (1969) are as follows:

1: the art or act of identifying a disease from its signs and symptoms;

\* \* \*

3: investigation or analysis of the cause or nature of a condition, situation or problem ... [4]

Assuming without deciding that the Board could not rationally find that Dr. Joseph "identif[ied] a disease from its signs and symptoms"—and the identification of the reasons for the girl's death arguably came quite close to that definition—we do not think it would be plainly wrong for the Board to conclude that he conducted an "investigation" and "analysis" of "the nature of [the girl's] condition," and specifically of the cause of her death.

■ Dr. Joseph's contention that the statute proscribes only those false reports and records which were made in conjunction with patient care is not, in our view, so plainly sound that the Board was compelled to adopt it. Such a construction of the Act would apparently exclude, among other activities, pre-employment physical examinations. False statements made in conjunction with medical evaluations performed for various public or private benefit programs, such as worker's compensation, social security, and public and private pension systems would also be immune. We agree with the District that this interpretation of the statutory definition runs afoul of common sense, and probably would not vindicate the intention of the legislature. At

**3.** Although the statute says "prevent, diagnose *and* treat," Dr. Joseph concedes, providently in our view, that there is a sufficient connection with the practice of medicine if a false report is made in connection with any one of these three activities. The Board need not show, in other

words, that the physician was preventing, diagnosing *and* treating a disease or condition.

**4.** We have omitted Webster's second definition, which does not apply here.

the very least, the Board could properly conclude that this is so.

In *Wassermann v. Board of Regents of the State University of New York,* 11 N.Y.2d 173, 182 N.E.2d 264, 227 N.Y.S.2d 649, *appeal dismissed,* 371 U.S. 23, 83 S.Ct. 121, 9 L.Ed.2d 96 *cert. denied,* 371 U.S. 861, 83 S.Ct. 116, 9 L.Ed.2d 99 (1962), the New York Medical Committee on Grievances revoked a doctor's license to practice as a result of his participation in a scheme to defraud insurance companies. The doctor had submitted false and exaggerated medical reports and bills to an attorney for the latter's use in settling personal injury cases. In some instances the doctor had not treated or examined the attorney's clients at all. Proceedings were instituted against the doctor pursuant to a statute authorizing discipline for "fraud or deceit in the practice of medicine." New York's statutory definition of practice of medicine was similar for present purposes to the District's.

The doctor contended, as Dr. Joseph argues here, that the fraud which he had perpetrated was not committed in the practice of medicine. He maintained that at "no time did he mistreat a *patient* or deliberately submit a false bill or diagnosis to a *patient,*" that his fraud was "in the realm of the business world," and that it did not involve his practice of medicine or suggest that he was incompetent to treat patients. *Id.* at 177, 182 N.E.2d at 265, 227 N.Y.S.2d at 651 (emphasis in original). The court disagreed:

> Nothing in the statute limits discipline for fraudulent diagnoses to cases where the fraud is perpetrated directly on the patient. Indeed, insurance companies are frequently the ultimate payers of medical bills in personal injury cases, and in this respect are just as much entitled to true medical reports and bills as are the patients. Appellant's fraudulent scheme, or course, was dependent upon misuse of his medical license, and the submission of false reports and bills to

interested persons was an integral part of his medical practice. *The preparation of medical reports for various purposes has always been regarded as a necessary part of medical practice, and it makes no difference whether false reports are submitted directly to the patient, attorney, or the insurance company on behalf of the patient. The statute authorizes discipline in any event.*

*Id.* at 177, 182 N.E.2d at 265, 227 N.Y.S.2d at 651–52 (emphasis added).[5]

Dr. Joseph relies primarily on *McDonnell v. Commission on Medical Discipline,* 301 Md. 426, 483 A.2d 76 (1984). Dr. McDonnell was the defendant in a medical malpractice action. He learned that two other physicians were scheduled to testify for the plaintiff. Dr. McDonnell expressed concern to his attorney that the two prospective witnesses lacked the relevant experience. Through intermediaries, he contacted the two men and advised them that he intended to have transcripts of their depositions disseminated to their local and national medical societies. Dr. McDonnell claimed that his purpose in doing so was "to make certain that the testimony of the witnesses would be honest," but he later admitted that his actions were "wrong, improper and injudicious." *Id.* at 433, 483 A.2d at 79.

The Maryland Commission on Medical Discipline concluded that Dr. McDonnell was guilty of immoral conduct "in his practice as a physician." Md.Code Art. 43 § 130(h)(8) (1980). The Maryland Court of Appeals held, however, that Dr. McDonnell's improper actions were not "directly tied to the physician's conduct in the actual performance of the practice of medicine, *i.e.* in the diagnosis, care, or treatment of patients." 301 Md. at 437, 483 A.2d at 81. Accordingly, the court set aside the reprimand which had been imposed by the Commission.

*McDonnell* was not an easy case; the Maryland Court of Special Appeals had

---

5. Dr. Joseph's misconduct might reasonably be viewed as somewhat less serious than that of Dr. Wassermann. The degree of culpability, however, affects the choice of sanctions rather than the applicability of the statute. The difference between the two cases in terms of the gravity of the misconduct was recognized by the disciplinary authorities; Dr. Joseph was reprimanded and fined, while Dr. Wassermann's license was revoked.

agreed with the Commission that the doctor's conduct was sufficiently related to the practice of medicine to warrant disciplinary action against him. *Commission on Medical Discipline v. McDonnell*, 56 Md.App. 391, 467 A.2d 1072 (1983). In any event, we find the case distinguishable from the present one in a decisive respect. Dr. McDonnell's intimidation of witnesses, even in a medical malpractice case, had no intrinsic connection with the practice of medicine. No diagnosis was involved. Dr. Joseph's inflation of his credentials as an expert witness, on the other hand, bore directly on the question whether his medical diagnosis would be credited. In other words, Dr. Joseph lied under oath in his capacity as a *medical* expert, about his own *medical* qualifications, in order to have his diagnosis of the deceased patient's condition accepted by the jury.[6] The false statements in the *curriculum vitae* could likewise have been intended only to add weight to his medical judgments.

The Maryland Commission, which must surely have been aware of the *McDonnell* decision, nevertheless found that Dr. Joseph's false reports were made "in the practice of medicine." As we have noted at page 1087, *supra*, the Commission specifically stated in a footnote to its Conclusions of Law, that Dr. Joseph was engaged in the practice of medicine when he gave his opinion, based on the patient's records, that the treating physician had not complied with the applicable standard of care.

It may be that the point here under consideration was not contested in the Maryland proceeding, and the dispute there may have lacked the "concrete adverseness which sharpens the presentation of issues upon which the court so largely depends

for illumination of difficult constitutional [7] questions." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).[8] That neither the Commission nor, apparently, Dr. Joseph (who was represented in Maryland by his able counsel in the District of Columbia proceeding) took the position that Dr. Joseph's case was controlled by *McDonnell*, however, reinforces our view that the two situations are distinguishable in the decisive respect discussed above. The Board reasonably concluded that Dr. Joseph's misstatements were made in the practice of medicine.

### III

For the foregoing reasons, the decision of the District of Columbia Board of Medicine must be and it is hereby

*Affirmed.*

---

6. Dr. Joseph testified that he thought the South Carolina case involved an "inexcusable breach of the standard of care" and stated that "in the heat of being so concerned about the care of this child I rose to any lengths to prove my point." The following ensued:

> Q. Rose to any lengths, meaning you created [a] novel c.v. and got another board certification?
> A. Yes sir.

7. Or non-constitutional.

8. The order of the Maryland Commission included a "Consent" by Dr. Joseph in which he represented that "I hereby consent and submit to the foregoing Order and its conditions." Dr. Joseph specifically stated that "I do not admit the truth of the charges." There is no indication whether or not Dr. Joseph consented to the Conclusions of Law.