Gregory K. MORRIS, Petitioner,

v.

DISTRICT OF COLUMBIA BOARD
OF MEDICINE, Respondent.

No. 96–AA–1399.

District of Columbia Court of Appeals.

Argued Sept. 11, 1997.
Decided Oct. 9, 1997.

Richard L. Aguglia, with whom Pauline A. Schneider and Shannon J. Hales, Washington, DC, were on the brief, for petitioner.

James C. McKay, Jr., Assistant Corporation Counsel, with whom Jo Anne Robinson, Interim Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for respondent.

Before SCHWELB and FARRELL, Associate Judges, and PRYOR, Senior Judge.

FARRELL, Associate Judge:

Petitioner Morris, a graduate of Emory University Medical School who is licensed to practice medicine in other jurisdictions, applied to the District of Columbia Board of Medicine (the Board) to be licensed in the District of Columbia. The Board denied the application on the grounds that, in his role as Vice President and Medical Director of Blue Cross and Blue Shield of the National Capital Area (Blue Cross), Dr. Morris (1) had practiced medicine in the District without a license and (2) had used the abbreviation "M.D." with the intent to represent that he practiced medicine in the District. This petition for review followed. D.C.Code § 2–3305.20 (1994).

As to the first ground, even allowing for the special deference this court gives to the Board's interpretation of the statute it administers, we hold that there is no substantial evidence in the record that Dr. Morris practiced medicine in the District within the statutory meaning of that phrase. As to the second, we likewise hold that there is no substantial evidence in the record that Dr. Morris, by using his title "M.D." in the written correspondence upon which the Board relied, intended to represent that he practiced medicine in the District. We therefore reverse the decision of the Board and remand for further proceedings consistent with this opinion.

## I.

Dr. Morris holds valid licenses to practice medicine in Georgia, Maryland, and Virginia. In 1991 he was hired by Blue Cross as Vice President and Medical Director for Health Affairs, and was later promoted to Senior Vice President for Health Care Delivery where he remained until leaving the company in early 1995. In March 1993 he applied for a license to practice medicine in the District of Columbia. In July 1994 the Board sent a letter to the President and CEO of Blue Cross stating that Dr. Morris had not obtained a license to practice in the District,

that his current application for a license was incomplete, and that he should complete the application or "cease and desist from the unlicensed practice of medicine." In November 1994 Dr. Morris received a proposed consent order from the Board stipulating that it would grant him a license if he signed the order and paid a fine of $3,600, one hundred dollars for each month that he had assertedly engaged in unlicensed practice. The letter warned of disciplinary action if Dr. Morris did not pay the fine.

In a December 1994 letter to the Board, Dr. Morris declined to consent to the order or pay the fine, contending that he had not practiced medicine in his capacity as Medical Director of Blue Cross. The Board thereafter informed him by letter of its intent to deny his application for a license on the dual grounds that he had practiced medicine without a license in the District from September 1991 to September 1994, and had used the title "M.D." in written correspondence with the Board, thereby violating D.C.Code § 2–3310.3(g).

At Dr. Morris' request, the Board held an evidentiary hearing on the proposed denial. Thereafter it entered findings of fact and conclusions of law and denied the application for a license, concluding that Dr. Morris had failed to demonstrate by a preponderance of the evidence, 17 DCMR § 4115.2 (1990), that he had not practiced medicine without a license during the period alleged and had not unlawfully used the term "M.D." during the same period.

## II.

Testimony at the hearing established that in both of his positions at Blue Cross, Dr. Morris was "responsible for oversight of the network development functions within Blue Cross as well as the utilization management functions." This meant that he "manag[ed] the directors that were directly responsible for building the networks [of health care providers]" by "engaging physicians, hospitals, [and] other types of health care entities, to develop the network that was used by Blue Cross and Blue Shield subscribers to receive health care services." Furthermore,

as Medical Director, Dr. Morris managed the process by which post-treatment claims for payment by participating physicians were reviewed and appealed. (He did not manage the pre-treatment decisionmaking process.)

In the post-treatment process, Blue Cross utilized a panel of licensed physician consultants from the Metropolitan area with varying specialties to make recommendations concerning payment of claims and/or possible inappropriate treatment. Individual medical advisors from this panel would review, through two levels of appeal, cases involving non-payment decisions and questionable or unnecessary treatment. A Committee on Provider Services would then handle additional levels of appeal. Dr. Morris sat on these peer review committees as a staff person and could comment on the cases but could not vote. When a committee made written recommendations as to payment or whether a physician should be retained in the provider network or reported to the Board of Medicine, Dr. Morris reviewed the recommendations for clarity and then wrote letters to the physician or the Board communicating the Committee's decision.

According to Dr. Morris, "[t]he process that we have in place [at Blue Cross] is built around the advisers' opinions." While they were not "binding decisions," in "every case [he was] aware of" Blue Cross had "followed the recommendations of the committee, and many of those decisions are . . . adverse to Blue Cross." There was nothing in the appeal process that allowed him "to send things back to" the committee to reconsider a recommendation, and to the best of his memory he had never questioned the accuracy of the medical advisers' analyses in discussions with them. Dr. Morris "had no say in the outcome of the cases"; his function was to establish the review process and then "represent [the] opinions" of the consultants by "relaying" them to the affected physician or

Board. As he summarized the process, "[T]he opinions offered are . . . the opinions of the medical advisers that have reviewed the cases. . . . I build the process, and . . . the consultants that work with us . . . make those determinations." No other witness described Dr. Morris's role differently.[1]

Blue Cross did not require a license to practice medicine for a person to perform Dr. Morris's functions. According to the Vice President and General Counsel of Blue Cross, the position was an administrative one that required knowledge and understanding of managed health care policy. Dr. Morris testified that other organizations had directors of health services or network management who were not physicians, and at Blue Cross a "Vice President for Health Care Finance" had responsibilities similar to his and was not a physician. The Board, despite its conclusion that Dr. Morris had practiced medicine during the relevant time, found that "[t]he duties and responsibilities of [his] position were exclusively administrative."

## III.

D.C.Code § 2–3310.1, part of the D.C. Health Occupations Revision Act of 1986, D.C.Code §§ 2–3301 *et seq.* (the Act), provides that "[n]o person shall practice, attempt to practice, or offer to practice a health occupation licensed or regulated under this chapter in the District unless currently licensed, or exempt from licensing, under this chapter."[2] A license is required to practice medicine within the District. § 2–3305.1. The Board of Medicine after a hearing may deny a license to practice medicine to an applicant who has violated any provision of the Act. § 2–3305.14(a)(24), (c)(1). The Board denied Dr. Morris a license primarily because it concluded that he had practiced medicine in the District without a license. The correctness of that conclusion thus depends on a

---

1. Dr. Morris could not recall meeting one-on-one with any physician appealing a payment determination to discuss the latter's medical practices or utilization of services. When a Board member suggested that the Board could subpoena witnesses who would testify that Dr. Morris justified Blue Cross's decision to them based on his own medical experiences and training, he replied that

any opinions or standards he might have conveyed to those physicians were those of the medical advisers, not his own. No witnesses were called to rebut these representations.

2. There are four exemptions, none of which applied to Dr. Morris. § 2–3305.2.

proper understanding of § 2–3301.2(7), which defines the "[p]ractice of medicine" to mean:

the application of scientific principles to prevent, diagnose, and treat physical and mental diseases, disorders, and conditions and to safeguard the life and health of any woman and infant through pregnancy and parturition.

This court has had only one occasion to interpret that language. In *Joseph v. District of Columbia Board of Medicine*, 587 A.2d 1085 (D.C.1991), we recognized that we do not do so in a vacuum. Rather, "members of the Board of Medicine are presumed to have substantially greater familiarity than do judges with the meaning of terms like 'the practice of medicine,' " so that if a decision of the Board rests upon its interpretation of the statute,

we must give the Board's decision substantial weight. The Board's interpretation of the statute is binding on us unless it is plainly erroneous or conflicts with the language or purpose of the statute.... If the Board's interpretation can reasonably be reconciled with the statute, our task is at an end.

*Id.* at 1088 (citations omitted). In *Joseph*, the court upheld as reasonable the Board's refusal to limit the practice of medicine as defined to activity "in conjunction with patient care." *Id.* at 1089. We affirmed an order of the Board imposing reciprocal discipline on a doctor (licensed in the District) who had testified falsely and submitted a false report in his role as expert witness in a medical malpractice case involving the death of a girl during surgery. We reasoned that the Board could fairly find that the doctor's conduct amounted to "diagnosis" within the meaning of § 2–3301.2(7), in that he "conducted an 'investigation' and 'analysis' of 'the nature of [the girl's] condition,' and specifically of the cause of her death." *Id.* (quoting definition of "diagnosis" in WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 622 (1969)).

■ In its written opinion in this case, the Board did not state that Dr. Morris's conduct during the three-year period amounted to either "diagnos[is]" or "treat[ment]" of disease. Instead, it wrote broadly that the court in *Joseph* had "upheld the Board's recognition of a *sphere of actions* which arise out of the practice of medicine" (emphasis added), within which it found Dr. Morris's conduct to fit. In this court, the Board agrees that the statutory phrase must be anchored in the verbs that define "practice of medicine," and contends first that Dr. Morris's actions can reasonably be characterized as "treatment." The *"practical effect* of [his] activities as medical director of Blue Cross," the Board reasons in its brief, "was to influence the course of treatment of individual patients and, hence, to 'treat' them within the meaning of the Act" (emphasis added). Although he "may not have treated or diagnosed patients directly, he had a considerable influence"—a "substantial impact"—"on the treatment of patients insured by Blue Cross," since *"if health insurance is not available, a procedure very well might not be performed"* (emphasis added).

This definition of "treatment" is so open-ended that it cannot reasonably be squared with the statutory term. In normal medical usage, "treat" means "to care for ... medically or surgically: deal with by medical or surgical means." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2435 (1971). Conduct that merely "[a]ffects," "influences," or "substantially impact[s]" on the course of such care by others cannot itself be treatment without converting a major part of the business of health insurers such as Blue Cross into the "practice of medicine." Equating "treat[ment]" with any conduct that "practically [a]ffect[s]" it, in ways potentially involving no exercise of medical judgment, is contrary to any sensible interpretation of the statute.

■ At oral argument the Board reasoned, much more plausibly, that if Dr. Morris applied his medical training and experience to evaluate and question the procedures used by participating doctors, then he engaged in "diagnos[is]" in much the same that the physician in *Joseph* diagnosed after-the-fact in order to give his expert opinion in malpractice litigation. Dr. Morris acknowledges that if *as doctor* he had a voice in the recommendations of the medical advisers and review committees, then he was practicing medicine. He argues that the record con-

tains no substantial evidence that he did. We agree with Dr. Morris.

The strongest feature of the testimony the Board could cite at oral argument was Dr. Morris's acknowledgment that he regularly attended meetings of the Committee on Provider Services and took part there "in discussions regarding medical issues." Yet his testimony was uncontradicted that he took no part in the deliberations of the committee and had no vote on its recommendations.[3] He recalled no case where he had ever asked the medical advisers or committee members "to rethink their position" or even questioned them about a recommendation, other than to seek to clarify it before conveying it to the affected person or entity. Blue Cross's "policies of the appeal process" did not allow him "to send things back to the Committee on Provider Services" and he could recall no instance where Blue Cross had "acted out of accordance with the committee's recommendation." In any case where he might have met personally with physicians about individual claim denials, "the views that [he] represent[ed were] ... the views of the medical advisers that review the cases." In a word, he "had no say in the outcome of the cases." None of these descriptions of Dr. Morris's role was contradicted by other testimony at the hearing.

■ While Dr. Morris signed letters containing committee recommendations as "Gregory K. Morris, M.D., Vice President and Medical Director," no substantial evidence supports the Board's finding that *as a physician* he "adopted those recommendations and made them his own." He admitted signing such letters as "the corporate agent of Blue Cross" and that legally the committees could not "corporately represent" and "bind Blue Cross." But this acknowledgment does not help the Board's position unless the fact that Blue Cross was a *business* entity separate from its medical consultants (hence in theory could reject their recommendations for business reasons) makes the actions of its "corporate agent" the practice of medicine. Self-evidently it does not. Nor does the fact that Dr. Morris bore the title of Medical Director (a title Blue Cross reserved for a physician occupying his position) or that Blue Cross desired a physician in the job because "there would be a significant amount of interaction with health care providers" and "physicians are generally more prone to listen to other physicians," support the Board's finding. A key part of Dr. Morris's duties, as he explained, was "building the networks" of physicians used by Blue Cross and its subscribers. The fact that he could gain readier access to such physicians via his own credentials does not make his "interactions" with those doctors the practice of medicine.

In sum, the conclusion that Dr. Morris was not engaged in the practice of medicine during the relevant time follows ineluctably from the record. The Board itself found that "[t]he duties and responsibilities of [the Medical Director] position were exclusively administrative," and so they were in Dr. Morris's case.

This does not mean, of course, that on other facts a medical administrator of a health insurer such as Blue Cross which monitors and regularly questions treatment decisions by physicians, may not be found to have practiced medicine as defined in § 2–3301.2(7). The focus must be on the actions of the individual administrator, not his job title or identification as "M.D." On the record of this case, however, no substantial evidence supports the finding that Dr. Morris practiced medicine during the time alleged. A contrary determination would subject a person in Dr. Morris's position not just to denial of a license and a civil fine, but also to the possibility of criminal punishment. *See* § 2–3310.7. And that could be so even if the person were not a trained physician such as Dr. Morris but, say, a business executive experienced in medical administration. Hence, the deference this court owes the Board's interpretation of the statute must be accompanied by concern that an overbroad reading of "practice of medicine" would be a trap for the unwary.

In light of our decision, we do not reach Dr. Morris's secondary argument, citing

---

3. An affidavit of Dr. Morris's predecessor as Medical Director, Dr. Jack Kleh, was admitted in evidence and stated that Dr. Kleh's role in regard to review of claims had been to "act[] as an information resource for physician review committees."

*Lewis v. District of Columbia Comm'n on Licensure,* 385 A.2d 1148 (D.C.1978), that only the adoption of regulations bringing the conduct of health administrators like himself within the reach of the statutory definition could give him adequate notice.

### IV.

The second reason why the Board denied Dr. Morris a license is that (in its words) he "used the term 'M.D.' in the District of Columbia although not authorized to practice medicine, in violation of D.C.Code § 2–3310.3(g)." That section makes it unlawful for a person not licensed to practice medicine under the Act to "use or imply the use of the words ... medical doctor [or] M.D. ... or any similar title or description of services with the intent to represent that the person practices medicine." In its brief, the Board states that the "primary evidence in support of this conclusion"—indeed, the only evidence it discusses—is two 1993 letters that Dr. Morris sent in his capacity as Medical Director, one to the Board and the other to the Maryland Board of Medicine with a copy to the Board. The first stated that a review of the practice of a named physician had revealed serious problems concerning, for example, the doctor's "excessive and fragmented charges for surgical procedures" and "inaccurate levels of care for office visits," and that Blue Cross believed itself obligated "to bring our concerns" to the Board's attention. The second letter likewise followed a review of the practice of a named physician, and stated that "[d]ue to the seriousness of problems revealed during that review" Blue Cross was "referring details of these issues to [the respective Boards] for your evaluation."

Neither letter fairly supports the Board's finding that in signing the letters as "Gregory K. Morris, M.D., Vice President and Medical Director," Dr. Morris intended to represent that he was practicing medicine in the District of Columbia. The letters accord fully with his testimony at the hearing that in correspondence such as this he was relaying to the licensing authority the results of peer investigations and evaluations by the licensed medical consultants to Blue Cross. The letters are replete with references to Blue Cross's standard practice of referring suspected irregularities to medical advisors, "licensed physicians in local practice," and to the peer review committee "comprised of locally practicing physicians" responsible for "reviewing and recommending resolution in cases involving disputed claims." The letters state in detail, through attachments, the findings and recommendations of those physician advisers or committees. Viewed as a whole, neither letter reasonably supports a finding that Dr. Morris meant to endorse those recommendations as representing his own evaluation ("diagnos[is]") of the questioned conduct.

In this court the Board also relies on D.C.Code § 2–3310.2 ("Misrepresentation"), which states: "Unless authorized to practice a health occupation under this chapter, a person shall not represent to the public by title ... or otherwise that the person is authorized to practice the health occupation in the District." This provision does not avail the Board either. Just by accurately affixing "M.D." to his name and title, Dr. Morris did not represent to the Board that he was licensed to practice medicine in the District of Columbia. The result might be different had the letters been directed to an unsophisticated portion of "the public" instead of the Board. And, having used stationery reflecting his District address, Dr. Morris would have been better advised in any event to disclaim licensure in the District or list the jurisdictions in which he was licensed to practice medicine. But given their context, we conclude that the letters did not constitute a representation prohibited by the statute unless they otherwise conveyed the impression that the opinions contained therein stemmed partly from Dr. Morris's own exercise of medical judgment ("application of scientific principles"). As we have already determined, they did not.

### V.

Accordingly, the decision of the Board is reversed and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*