# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-SA-00654-COA

**MISSISSIPPI STATE BOARD OF MEDICAL LICENSURE**                    **APPELLANT**

v.

**RAY ANTHONY HARRON, M.D.**                                        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/20/2013 |
| TRIAL JUDGE: | HON. PATRICIA D. WISE |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | STANLEY T. INGRAM |
| | TRAVIS JONATHAN CONNER |
| ATTORNEY FOR APPELLEE: | EDWARD BLACKMON |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| TRIAL COURT DISPOSITION: | REVERSED THE RULING OF THE BOARD |
| | OF MEDICAL LICENSURE |
| DISPOSITION: | REVERSED AND RENDERED: 09/16/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**LEE, C.J., FOR THE COURT:**

¶1.     The Mississippi State Board of Medical Licensure (the Board) disciplined Dr. Ray A.

Harron for his involvement in silicosis litigation in Texas, by ordering that he never

attempted to renew his lapsed medical license. As part of the discipline, the Board notified

a national physician's data bank that Dr. Harron's actions had the potential to harm patients.

Although Dr. Harron agreed to the discipline, he disagreed that his actions as an expert

witness had the potential to harm patients. He therefore appealed the Board's action to the

Hinds County Chancery Court. The chancery court reversed the Board's action, ruling that

it had no jurisdiction, that its ruling lacked substantial evidence, and that its notification to the physician's data bank was arbitrary and capricious. The Board has appealed this decision.

¶2. Finding reversible error, we reverse and render.

## FACTS AND PROCEDURAL HISTORY

¶3. Dr. Harron was issued a medical license in Mississippi in 1995. It lapsed in 2007. Dr. Harron stopped seeing patients in 1995, and started working for Netherland & Mason (N&M), a Mississippi company that screened potential plaintiffs for asbestosis and silicosis-related diseases. In 2001, Dr. Harron shifted focus to screening persons for potential silicosis claims.

¶4. The filing of silicosis cases involving thousands of claimants led to the creation of a multi-district litigation (MDL) proceeding in Texas, styled *In re Silica Products Liability Litigation*, 398 F. Supp. 2d 563 (S.D. Tex. 2005). This case, presided over by United States District Judge Janis Graham Jack, involved 111 cases totaling over 10,000 individual plaintiffs.[1] *Id.* at 566. A *Daubert* hearing[2] was held in February 2005, at which Dr. Harron, and other witnesses, testified.[3]

---

[1] The majority of these plaintiffs were from Mississippi and Alabama. *Id.* at 674. Of the 111 lawsuits, 107 were filed in Mississippi. *Id.* at 573.

[2] *Daubert v. Merrell Dow Pharm. Inc.,* 509 U.S. 579 (1993).

[3] Dr. Harron was hired by plaintiffs' lawyers as a radiologist and "certified B reader." A "B" reader is a physician certified by the National Institute for Occupational Safety and Health as demonstrating proficiency in classifying chest x-rays and in the use of the International Labor Office (ILO) scale for interpreting chest x-rays for pneumoconiosis and other diseases. *See Woodward v. Dir., OWCP*, 991 F.2d 314, 316 n.4 (6th Cir. 1993).

2

¶5.    Dr. Harron was involved in performing "B-reads" or producing diagnosing reports on 6,700 of the claimants in the Texas litigation.  He was listed as the diagnosing physician on 2,600 of these claims.  Dr. Harron testified about his practices of letting medically untrained secretaries and typists interpret his reports, insert a diagnosis, stamp his signature on the reports, and send them out with no review by him.  He testified that he "might" have given a copy of his signature stamp to N&M when he "got behind on typing."[4]  He testified that "anybody" could have stamped his signature to reports.  While being questioned about how he could diagnose a specific claimant with asbestosis and later diagnose the same claimant with silicosis based on reading the same x-ray, he asked for a lawyer to represent him, and all questioning of him was halted by the judge.

¶6.    At the conclusion of the hearing, the court ruled that Dr. Harron's proposed expert testimony (and that of some other doctors) was unreliable and excluded it.  *Id.* at 637-40.  Specifically, the court found that Dr. Harron relied on medical histories performed by lawyers and nonmedical personnel, which were "so deficient as to not even merit the label." *Id.* at 624; *see generally id*. at 622-25.  The court further found that Dr. Harron's (and other doctors') review of x-rays lacked quality-control measures, *id.* at 627, and produced results that were described by other experts as "staggering," "implausibl[e]," "unsound," and "stunning and not scientifically plausible." *Id.* at 628-29; *see generally id*. at 625-29.  Judge Jack found that Dr. Harron

> relied upon occupational/exposure histories and medical histories which fail
> to even merit the title, "history," let alone meet the generally-accepted

---

[4] Judge Jack noted Dr. Harron's testimony that N&M had a stack of blank reports pre-signed by Dr. Harron. *See In re Silica Prods. Liab. Litig.,* 398 F. Supp. 2d at 601.

3

scientific methodology for diagnosing silicosis.

. . . .

> With respect to Dr. Harron, he simply ignored the third criterion for diagnosing silicosis (i.e., the absence of any good reason to believe that the positive radiographic findings are the result of some other condition). . . .
>
> Perhaps even more stunning was Dr. Harron's reliance on largely untrained secretarial staff to "translate [the ILO form he completed] into English[,]" . . . "prepare [his] reports, stamp [his] name on them and send those reports out without [him] editing or reviewing them" . . . . Dr. Harron did not read, review or even see any of the 99 diagnosing reports . . . bearing his name. This "distressing" and "disgraceful" procedure does not remotely resemble reasonable medical practice. . . . Not only is this "technique" not generally accepted in the scientific community, but it is utterly lacking in any "standards controlling the technique's operation." [*United States*] *v. Hicks,* 389 F.3d 514, 525 (5th Cir. 2004) (among the reliability factors are "the existence and maintenance of standards controlling the technique's operation; and . . . whether the technique has been generally accepted in the scientific community") (citing *Daubert*, 509 U.S. at 593-94).
>
> Moreover, as recounted above, the sheer volume of Dr. Harron's asbestosis/silicosis reversals (i.e., reading an x-ray as consistent with asbestosis for asbestos litigation and then reading the same individual's x-ray as consistent with silicosis for silica litigation), simply cannot be explained as intra-reader variability. . . . Instead, it can only be explained as a product of bias – that is, of Dr. Harron finding evidence of the disease he was currently being paid to find.

*Id.* at 637-38 (citations omitted). The court also imposed sanctions against the law firm tendering Dr. Harron as an expert witness. *Id.* at 676.

¶7.     In early 2007, the Texas Medical Board instituted disciplinary proceedings against Dr. Harron based upon his activities in relation to the silicosis litigation. As a result of those proceedings, Dr. Harron entered into an agreed order dated April 13, 2007, in which he surrendered his Texas medical license, and agreed not to seek its renewal.

¶8.     In July 2007, the Board also instituted disciplinary proceedings against Dr. Harron.

4

During these proceedings, Dr. Harron entered into an agreed order, approved by the Board in November 2007, in which he agreed to never seek renewal of his Mississippi medical license and to pay all costs of the investigation and disciplinary hearings up to $5,000. The agreed order expressly stated that the results of the proceeding would be reported to the National Practitioners Data Bank (NPDB), a data bank that monitors disciplinary actions involving doctors.

¶9. The Board submitted an Adverse Action Report to the NPDB. In the report a question was asked: "Is the Adverse Action Specified in This Report Based on the Subject's Professional Competence or Conduct, Which Adversely Affected, or Could Have Adversely Affected, the Health or Welfare of the Patient?" The Board answered "Yes" to this question. Dr. Harron filed a written dispute with the NPDB, claiming that he acted only as an expert witness and not in a doctor-patient relationship, and that as a result, his actions could not have harmed a patient. Dr. Harron then refused to pay the $5,000 in costs.

¶10. In 2009, the Board held a hearing after which it concluded that Dr. Harron had violated Mississippi Code Annotated section 73-25-29(8)(d) and (13) (Rev. 2012), as well as Mississippi Code Annotated section 73-25-83 (Rev. 2012), and reaffirmed its report to the NPDB. Dr. Harron was again ordered to pay the $5,000 in costs.

¶11. Dr. Harron appealed this decision to the Hinds County Chancery Court. The chancellor remanded for further hearings on whether the parties had come to a full agreement in the agreed order.

¶12. Rather than proceed on the original agreed order, the parties agreed to start the disciplinary process anew. New charges were filed, charging Dr. Harron with violations of:

5

Section 73-25-29(8)(d) – unprofessional conduct which includes but is not limited to, being guilty of any dishonorable conduct or unethical conduct likely to deceive, defraud or harm the public;

Section 73-25-29(9) – refusal of a licensing authority of another state or jurisdiction to issue or renew a license to practice medicine and/or having restrictions imposed on a license to practice medicine in another state or jurisdiction;

Section 73-25-29(10) – surrender of a license to practice medicine in another state or jurisdiction while under disciplinary investigation by any of those authorities or bodies for acts or conduct similar to acts or conduct which would constitute grounds for action;[5] and

Section 73-25-83(a) – unprofessional conduct as defined in the physician

---

[5] Mississippi Code Annotated section 73-25-29 (Rev. 2012) provides:

The grounds for the nonissuance, suspension, revocation or restriction of a license or the denial of reinstatement or renewal of a license are:

. . . .

(8) Unprofessional conduct, which includes, but is not limited to: . . .

(d) Being guilty of any dishonorable or unethical conduct likely to deceive, defraud or harm the public.

(9) The refusal of a licensing authority of another state or jurisdiction to issue or renew a license, permit or certificate to practice medicine in that jurisdiction or the revocation, suspension or other restriction imposed on a license, permit or certificate issued by such licensing authority which prevents or restricts practice in that jurisdiction, a certified copy of the disciplinary order or action taken by the other state or jurisdiction being prima facie evidence thereof, notwithstanding the pendency of any appeal.

(10) Surrender of a license or authorization to practice medicine in another state or jurisdiction or surrender of membership on any medical staff or in any medical or professional association or society while under disciplinary investigation by any of those authorities or bodies for acts or conduct similar to acts or conduct which would constitute grounds for action as defined in this section.

licensure and disciplinary laws pursuant to section 73-25-29.[6]

¶13.    At the hearing conducted in January 2012, Dr. Harron admitted his prior testimony at the *Daubert* hearing but defended his actions as not being the practice of medicine.  He admitted that he had pleaded the Fifth Amendment in testifying before congressional hearings on the silicosis mass-tort litigation, and he volunteered that he was the target of an ongoing criminal grand-jury investigation in New York involving asbestosis.

¶14.    At the conclusion of the hearing, the Board found Dr. Harron guilty of:

> Count three – unprofessional conduct likely to deceive, defraud or harm the public, including but not limited to, pre-signing blank ILO forms and allowing them to be filled out at a later date (without further review);

> Count four – unprofessional conduct likely to deceive, defraud or harm the public, including but not limited to, allowing or otherwise instructing non-medically trained, non-allied health care personnel to interpret medical records and render medical diagnosis under his signature or signature stamp;

> Counts five and six – having restrictions imposed on his license to practice medicine in another state or jurisdiction while under disciplinary investigation by a state licensure board in response to allegations related to conduct in silica litigation.[7]

---

[6] Section 73-25-83(a) provides:

The board shall have authority to deny an application for licensure or other authorization to practice medicine in this state and to discipline a physician licensed or otherwise lawfully practicing within this state who, after a hearing, has been adjudged by the board as unqualified due to one or more of the following reasons:

Unprofessional conduct as defined in the physician licensure and disciplinary laws, pursuant to Section 73-25-29 . . . .

[7] The Board found Dr. Harron not guilty of charges related to his "capitulation" in letting the lawyers and screening company insert language in his reports that he relied upon a physical examination in his diagnosis when he did not, and in letting individuals with no medical training take the claimants' histories.

¶15.    By order dated January 19, 2012, the Board permanently barred Dr. Harron from renewing his medical license and ordered him to pay the costs of the investigation, up to $10,000.  The Board's order stated that its previous answer on the NPDB form that Dr. Harron's actions could have adversely affected the health or welfare of the patient would remain unchanged.

¶16.    Dr. Harron appealed this January 19, 2012 order to the Hinds County Chancery Court. The chancery court ruled that the Board lacked jurisdiction to discipline a doctor for testifying as an expert witness in another state, and as a consequence, the Board lacked substantial evidence to revoke Dr. Harron's license.  The chancellor also ruled that the Board's action in telling NPDB that Dr. Harron's actions could have harmed a patient was arbitrary and capricious since the Texas Board had answered that same question "No."  The chancellor finally ruled that Dr. Harron's due-process rights had not been violated in the hearing before the Board.[8]

¶17.    The issues we consider on appeal are: (1) whether the Board had jurisdiction to discipline Dr. Harron for his activities as an expert witness in Texas, and whether its decision was based on substantial evidence, and (2) whether the Board's findings were arbitrary and capricious.[9]

---

[8] The chancery court order mistakenly references the Board's order dated September 17, 2009.  This was an earlier order, and the final Board order appealed to the chancery court was the Board's January 19, 2012 order.  It is this 2012 Board ruling that is the subject of this appeal.

[9] Although both parties brief the issue of whether the use of hearsay at the Mississippi State Board of Medical Licensure hearing deprived Dr. Harron of due process, this issue is not properly before this Court.  Dr. Harron did not cross-appeal the chancellor's ruling that he was not denied due process at the hearing.  Dr. Harron's failure to cross-appeal this ruling

8

STANDARD OF REVIEW

¶18.   Under Mississippi's Constitution, our courts do not undertake de novo retrial of matters on appeal from administrative agencies.   This is because "[o]ur courts are not permitted to make administrative decisions and perform the functions of an administrative agency." *Miss. State Bd. of Nursing v. Wilson*, 624 So. 2d 485, 489 (Miss. 1993) (citation omitted).   Under our standard of review, "[t]he only grounds for overturning administrative agency action by the appellate process is that the state agency has acted capriciously, unreasonably, arbitrarily; has abused its discretion[;] or has violated a vested constitutional right of a party." *Id.* (citation omitted).   "[T]here is a rebuttable presumption in favor of the action of an administrative agency and the burden of proof is upon one challenging its action." *Id.* (citation omitted).   In *Mississippi Board of Nursing v. Hanson*, 703 So. 2d 239 (Miss. 1997), our supreme court stated: "This Court has given great deference to the decisions of administrative agencies, believing that they know best how to police their own, especially when the board sitting in judgment is comprised of fellow practitioners." *Id.* at 243.

DISCUSSION

---

removes it from appellate review. *See Lindsey v. Lindsey*, 612 So. 2d 376, 378 (Miss. 1992). In any event, Dr. Harron's own admissions corroborated the reliability of the *Daubert* hearing transcript and Judge Jack's opinion. *See Howell v. Miss. Emp't Sec. Comm'n*, 906 So. 2d 766, 771 (¶11) (Miss. Ct. App. 2004) ("Howell himself corroborated [a memo containing hearsay introduced at hearing.]"); *see also McClinton v. Miss. Dep't of Emp't Sec.*, 949 So. 2d 805, 814 (¶29) (Miss. Ct. App. 2006) ("[I]f hearsay, even if not corroborated in the traditional sense, is highly probative because it has strong indicia of reliability, it can at least in many situations be substantial evidence."). As we note hereafter, Dr. Harron personally admitted to all the relevant evidence at the Board hearing.

9

I.    JURISDICTION

¶19.    The chancellor ruled that the Board had no jurisdiction to discipline Dr. Harron because his actions were as an expert witness and he was not engaged in the practice of medicine. The chancellor further ruled that, because he was not practicing medicine, the Board lacked substantial evidence to "strip away" his medical license.

¶20.    Dr. Harron's position is that giving expert testimony is not the "practice of medicine" and that the Mississippi Board has no authority to discipline a doctor for any action not constituting the actual practice of medicine.

¶21.    Dr. Harron first contends that Mississippi State Board of Medical Licensure Administrative Code Part 2635, Chapter 8 improperly attempts to regulate the testimony of medical experts. Since the Board did not proceed under this authority, it has no relevance to this proceeding. The Board proceeded directly under the statutory authority of Mississippi Code Annotated sections 73-25-29 and 73-25-83.

¶22.    The Board's administrative role in administering discipline is not limited to review of a licensee's abilities as a physician to practice medicine as defined in section 73-25-33.[10] It extends beyond that, for example, to issues relating to habitual drug use, conviction of a

_____

[10] Section 73-25-33 provides in relevant part:

> The practice of medicine shall mean to suggest, recommend, prescribe, or direct for the use of any person, any drug, medicine, appliance, or other agency, whether material or not material, for the cure, relief, or palliation of any ailment or disease of the mind or body, or for the cure or relief of any wound or fracture or other bodily injury or deformity, or the practice of obstetrics or midwifery, after having received, or with the intent of receiving therefor, either directly or indirectly, any bonus, gift, profit or compensation.

felony involving moral turpitude, obtaining a license by fraud, unprofessional conduct, and the requirement that licensees possess good moral character.

¶23. Contrary to the chancellor's ruling, the Board's jurisdiction to discipline doctors is not limited to situations where the doctor is actually practicing medicine on a particular patient. For example, in *Montalvo v. Mississippi State Board of Medical Licensure*, 671 So. 2d 53, 57-58 (Miss. 1996), the Board's action in refusing to reinstate the license of a physician who had been convicted in federal court of money laundering was upheld.

¶24. Citing *Reeves v. Claiborne County Board of Education*, 828 F.2d 1096, 1100 (5th Cir. 1987), Dr. Harron contends that statements made in legal proceedings are "absolutely privileged" and protected by the First Amendment. Implicit in this argument is that none of the admissions he made in the *Daubert* hearing could be used against him by the Board.

¶25. The "privilege" cases Dr. Harron cites all deal with defamation-type actions. None of the cases suggest that a witness's statements cannot be used against him in other contexts. Dr. Harron's testimony at the *Daubert* hearing was not privileged and was admissible against him as a party admission under Mississippi Rule of Evidence 801(d)(2)(A) ("A statement is not hearsay if: . . . [t]he statement is offered against a party and is (A) the party's own statement . . . .").

¶26. Dr. Harron cites two Mississippi Attorney General Opinions for the proposition that giving expert testimony in another state does not constitute the practice of medicine in Mississippi. In Miss. Att'y Gen. Op., 93-0088, 1993 WL 207359, *Morgan* (May 18, 1993), the Attorney General issued an opinion that doctors issuing pre-certification opinions, outside the State of Mississippi, concerning insurance coverage for upcoming medical procedures

11

were not practicing medicine in Mississippi. The opinion stated:

> Out of state utilization review, as we understand it, involves a physician who is not present in Mississippi, does not examine a patient in Mississippi, and does not give medical advice or perform medical services in Mississippi. It is our opinion that under such conditions such review does not constitute practice of medicine in Mississippi.

*Id.* In Miss. Att'y Gen. Op., 95-0610, 1995 WL 779738, *Bradshaw* (Dec. 8, 1995), the Attorney General opined that out-of-state doctors who are engaged in "tele-medicine" by "interpreting x-rays, CAT scans, MRI's and similar radiological workups, which have been communicated to that physician through either computer modum or via satellite," but "who [are] not physically practicing medicine in the State of Mississippi, [are] not 'practicing medicine' as defined by Section 73-25-33 and therefore [are] not required to be licensed by the Mississippi State Board of Medical Licensure."

¶27. The Attorney General's opinions are not relevant because those doctors were not licensed to practice medicine in Mississippi and subject to the Mississippi State Board of Medical Licensure. Dr. Harron, on the other hand, was licensed in Mississippi and subject to the Board's oversight responsibilities.

¶28. Under section 73-25-29(8)(d), the relevant question is whether Dr. Harron's activities in the Texas litigation were "likely to deceive, defraud or harm the public." Although the statute is not limited to the "Mississippi public," it bears noting that a great many of the patients targeted for Dr. Harron's unprofessional diagnoses were from Mississippi. Section 73-25-29(8)(d) authorizes the Board to regulate any Mississippi-licensed physician whose conduct (medical, ethical, or otherwise) poses a threat of harm to the public.

¶29. Dr. Harron relies on *Missouri Board of Registration for the Healing Arts v. Levine*,

12

808 S.W.2d 440 (Mo. Ct. App. 1991). In *Levine*, the Missouri Board of Medical Licensure sought to discipline a doctor because on two occasions he gave false answers under oath when testifying as a medical expert. *Id.* at 441. The Missouri Board argued that Levine's actions violated a Missouri statute providing that "the Board may cause a complaint to be filed against a physician for: . . . Incompetency, misconduct, gross negligence, fraud, misrepresentation or dishonesty *in the performance of the functions or duties of any profession* licensed or regulated by this chapter . . . ." *Id.* (emphasis added). The Missouri court found:

> [U]nder the plain language of "function" and "duty," testifying as a non-treating medical expert is not an "obligatory task," nor "a moral or legal obligation," nor even an act "expected of" a person. This court holds that acting as a non-treating expert medical witness does not constitute the practice of medicine or the function or duty of a licensee and that Levine is not subject to discipline under [the Missouri statute].

*Id.* at 443.

¶30. *Levine* is distinguishable because the Missouri statute differed in a critical way from the Mississippi statute applied to Dr. Harron. The Missouri statute limited discipline to cases involving "[i]ncompetency, misconduct, gross negligence, fraud, misrepresentation or dishonesty *in the performance of the functions or duties of any profession* licensed . . . ." *Id.* at 41 (emphasis added). In contrast, Dr. Harron was charged under section 73-25-29(8)(d), which is more broadly written. It authorizes the Board to administer discipline based on "[u]nprofessional conduct, which includes but is not limited to: [b]eing guilty of any dishonorable or unethical conduct likely to deceive, defraud or harm the public." *Id.* There is no requirement in the Mississippi statute that the conduct occur while engaged in the

13

practice of medicine.

¶31.     Dr. Harron also relies on *McDonnell v. Commission on Medical Discipline*, 483 A.2d 76 (Md. 1984).   In *McDonnell*, the court construed a Maryland statute that prohibited "[i]mmoral conduct of a physician *in his practice as a physician . . . .* "  *Id.* at 78 (emphasis added).  The court held that the Maryland Medical Commission had no authority to discipline a doctor, who was a defendant in a medical-malpractice action, for his intimidating telephone calls to witnesses against him, because this was not conduct occurring in his practice as a physician.  *Id.* at 81.

¶32.     The Maryland statute at issue in *McDonnell* limited the board's authority to cases of "[i]mmoral conduct of a physician *in his practice as a physician*."  *McDonnell*, 483 A.2d at 78 (emphasis added and citation omitted).  Unlike Mississippi's statute, it limited discipline to the actual practice of medicine.

¶33.     The chancellor noted that "[t]he charges against Dr. Harron involve his work as an expert witness and not as a treating physician to any specific patient."  This ignores that Dr. Harron's testimony was as a physician.  He was the actual diagnosing physician on a great many of the claims.  Even though Dr. Harron testified: "[I]t's a legal standard and not a real diagnosis,"[11] he was presented as the diagnosing physician on 2,600 claims.  He specifically testified at the *Daubert* hearing that each diagnosis was based upon: "I feel *within a reasonable degree of medical certainty* that this individual has [the particular disease]."  (Emphasis added).  He testified that he stood by his diagnoses.  Under direct questioning

---

[11] *In re Silica Prods. Liab. Litig*, 398 F. Supp. 2d at 635.

from the district judge, referring to his reports claiming each person had silicosis, Dr. Harron was asked: "Is this the diagnosis to be relied upon by other medical people and the patient?" Dr. Harron answered: "Yes." His participation in the Texas litigation included his diagnosing patients.

¶34. Dr. Harron argues that the only constraint on his testimony as an expert witness was Mississippi Rule of Evidence 702, and not statutes relating to the regulation of physicians.[12] The chancellor agreed, framing the issue and its resolution as follows:

> Dr. Harron contends that he was performing his duties as an expert witness and is not subject to Section 73-25-33 of the Mississippi Code. This Court agrees with Dr. Harron. Dr. Harron was not performing work as a physician; he was providing testimony as an expert witness and offering *his trained opinion, not medical opinion*, in the case before the Texas Court. Thus, this Court finds that the Mississippi Board lacks substantial evidence to strip away Dr. Harron's medical license in Mississippi because of expert testimony given.

(Emphasis added).

¶35. The chancellor erred in assuming that there is a difference in this case between an "expert" opinion and a "medical" opinion. As Judge Jack noted:

> It is also readily apparent that the failure of the challenged doctors to observe the same standards for a "legal diagnosis" as they do for a "medical diagnosis" renders their diagnoses in this litigation inadmissible under Rule 702. As both the Supreme Court and the Fifth Circuit have directed: "The district court's responsibility 'is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Skidmore v. Precision Printing & Pkg., Inc.,* 188 F.3d 606, 618 (5th Cir. 1999) (quoting *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999)).

*In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d at 634 (parallel citations omitted).

---

[12] This is so, despite the fact that he was testifying in a Texas court, where Mississippi Rule of Evidence 702 has no application.

¶36.   Although the Board has authority to discipline a doctor for his actions outside the actual practice of medicine, Dr. Harron was, in fact, providing medical services to 2,600 patients.  He was not simply testifying as an outside consultant with no connection to a patient, as when a doctor testifies as an expert on the standard of care.  He was testifying as the diagnosing physician for thousands of patients.  He issued reports claiming that each patient whose x-rays he reviewed was suffering from silicosis.  In *Wasserman v. Board of Regents of the University of the State of New York*, 182 N.E.2d 264  (N.Y. 1962), a doctor argued that his license could not be revoked because his acts in submitting fraudulent reports to a plaintiff's attorney did not involve the "practice of medicine." *Id*. at 266.  The New York court disagreed, stating: "The preparation of medical reports for various purposes has always been regarded as a necessary part of medical practice, and it makes no difference whether false reports are submitted directly to the patient, attorney, or the insurance company on behalf of the patient." *Id*.

¶37.   We find that the Board had jurisdiction to discipline Dr. Harron for his actions in diagnosing thousands of patients with silicosis.

¶38.   We further find that the Board's actions were based on substantial evidence.  Dr. Harron admitted to the conduct the Board found to violate counts three and four of the charging affidavit.  He admitted that: (1) his diagnoses were meant to be relied upon by other medical people and patients (count three); and (2) he allowed non-professionals to pre-stamp his signature on reports, prepare/translate his findings on the reports, and publish his reports without his final review and approval (count four).

¶39.   Although Dr. Harron attempts to distinguish a "legal" opinion from a "medical"

16

opinion, he was not offered as a legal expert; he was offered as a medical expert. His medical license gave him the privilege of offering that opinion. That license comes with a responsibility to his profession and the public at large, which the Board is empowered to oversee.

¶40. Counts five and six involved discipline imposed by the Texas Medical Board. Dr. Harron did not deny counts five and six (having surrendered his license and having been disciplined by the Texas licensing authority). The chancellor acknowledged this. Concerning these counts, the chancellor stated: "This Court does not ignore the undisputed facts that Dr. Harron's license was restricted in another state." This alone gives the Board the power to discipline Dr. Harron.

¶41. The chancellor, however, held that this was not important because:

> Dr. Harron was not performing work as a physician. He was providing testimony as an expert witness and was offering *his trained opinion, not medical opinion*, in the case before the Texas Court. The Court is of the opinion that the Mississippi Board acted in a whimsical manner, ignoring the fact that Dr. Harron was testifying as to his opinion as an expert witness[,] not as a practicing physician.

(Emphasis added).

¶42. This ruling ignores the fact that Dr. Harron's "expert" opinion was based upon his being a physician. Common sense dictates that, if he had prefaced his opinion by saying "speaking only as a layman, or as a legal expert, I believe the claimants suffer from X disease," the reports he issued would have been worthless. It is because he was a physician that his opinion was being offered. The chancellor's view that the entity created to protect the public from injurious practices by physicians has no authority to act – because a court

17

also has the ability under the rules of evidence to exclude baseless opinions – is erroneous. With the privilege of holding a valid medical license in Mississippi comes statutory oversight of the Board.

¶43.    The Board's discipline, based upon Dr. Harron's "unprofessional" conduct, was explicitly authorized by the statutes under which the Board proceeded – sections 73-25-29 and 73-25-83 – and was based on substantial evidence.

## II.    ARBITRARY AND CAPRICIOUS FINDINGS

¶44.    The chancellor ruled that the Board's actions were arbitrary and capricious because the Board answered the NPDB question about potential harm to a patient "Yes," while the Texas Medical Board answered the question "No."

¶45.    Citing *Adams v. Harron*, 191 F.3d 447 (4th Cir. 1999) (unpublished), Dr. Harron claims that the Board should not have reported to NPDB that his actions could have adversely affected a patient because he had no doctor-patient relationship with the plaintiffs in the MDL litigation and therefore no duty to them.  In *Adams*, Dr. Harron was hired to interpret x-rays of potential plaintiffs in asbestosis cases.  He found cancer on one individual's x-ray and informed the lawyer but did not inform the individual.  The individual subsequently died of cancer.  Dr. Harron was sued by the widow of the individual for medical malpractice.  The court determined that Dr. Harron had no doctor-patient relationship with the deceased and therefore no medical-malpractice liability.  *Id.* at *3.

¶46.    But the Board did not proceed against Dr. Harron for medical malpractice.  Rather, the discipline was imposed because of Dr. Harron's unprofessional conduct, as defined in sections 75-25-29 and 73-25-83.  The unprofessional conduct was Dr. Harron's opinion that

18

each plaintiff whose x-rays he examined, a great many of whom were Mississippi residents, in fact suffered from silicosis. These reckless claims could have had an adverse effect on the patient. Dr. Harron had the opportunity, and exercised it, to inform NPDB that his diagnosis came only in the context of serving as an expert witness and that these were not his personal patients. Nothing about this notification to NPDB makes the Board's discipline of Dr. Harron arbitrary or capricious.

¶47. The chancellor noted that the Texas Medical Board answered "No" to the question in the NPDB report as to whether Dr. Harron's actions "Adversely Affected, or Could Have Adversely Affected, the Health or Welfare of the Patient." The chancellor ruled that the Mississippi Board's answer "Yes" to this question was arbitrary and capricious because it was based on the same evidence before the Texas Board.

¶48. The record on appeal contains the Texas Board's order, but it does not contain a copy of the proceedings leading to that order. As previously stated, the Mississippi Board had the benefit of Dr. Harron's admissions before it that: (1) his diagnoses were meant to be relied upon by other medical people and patients (count three); and (2) that he allowed non-professionals to pre-stamp his signature on reports, prepare/translate his findings on the reports, and publish his reports without his final review and approval (count four). Since these practices could have harmed the patients, the Board could rely on Dr. Harron's own testimony to answer the question "Yes."

¶49. There can be no real dispute that misdiagnosing someone with having a deadly disease such as silicosis has the potential to harm that person. As Judge Jack noted:

Then there is the toll taken on the misdiagnosed Plaintiffs. If these Plaintiffs

19

truly have abnormal x-rays, then the radiographic findings may be caused by a number of conditions other than silicosis. And when the diagnosing doctors fail to exclude these other conditions, it leaves the Plaintiffs at risk of having treatable conditions go undiagnosed and untreated.

In the case of the Plaintiffs who are healthy, at least some of them can be expected to have taken their diagnoses seriously. They can be expected to have reported the diagnoses when applying for health insurance and life insurance—potentially resulting in higher premiums or even the denial of coverage altogether. They can be expected to report the diagnoses to their employers and to the Social Security Administration. And they can be expected to report the diagnoses of this incurable disease to their families and friends.

These people have been told that they have a life-threatening condition . . . . When dealing with this MDL and its 10,000 Plaintiffs, it is easy to forget that "statistics are human beings with the tears wiped off." . . . But it should not be forgotten that a misdiagnosis potentially imposes an emotional cost on the Plaintiff and the Plaintiff's family that no court can calculate.

*In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d at 636 (citation omitted).

¶50. Furthermore, the chancellor's ruling that it was arbitrary and capricious of the Board to answer the "potential harm" question differently from the Texas Medical Board strips the Board of its statutory duty to serve as an independent finder of fact. Even if faced with the exact same facts, the Board has the authority, and the duty, to adjudicate its disciplinary cases independently of what some other state's medical board might do.

¶51. We recognize that some of the patients Dr. Harron diagnosed with silicosis may actually have that disease. That does not excuse his unprofessional conduct in cranking out thousands of reports diagnosing the disease with no real attempt to differentiate those who actually have the disease from those with some remote possibility of having the disease. His actions attacked the integrity of the legal system, had at least the potential to harm his claimant/patients, and were a discredit to his profession, and to his Mississippi medical

20

license.

¶52.    The chancery court erred in ruling that the Board lacked jurisdiction and further erred in ruling that the Board lacked substantial evidence to discipline Dr. Harron and that its ruling was arbitrary and capricious.  Accordingly, we reverse and render.

¶53.    **THE JUDGMENT OF THE CHANCERY COURT OF HINDS COUNTY IS REVERSED AND RENDERED.  ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.**

**IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL AND FAIR, JJ., CONCUR.  JAMES, J., CONCURS IN PART AND DISSENTS IN PART.**